IN RE SWANTON MARKET AREA.

November Term, 1941.

Present: MOULTON, C. J., SHERBURNE, BUTTLES, STURTEVANT and JEFFORDS, JJ.

Opinion filed January 6, 1942.

*Sylvester & Ready* for petitioners.

*Robert H. Ryan* for Vermont Milk Producers Association, Walter Hayward, H. W. Hubbard and Ingleside Dairies.

STURTEVANT, J. This case is brought here by several people residing within the Swanton milk market area. They contend that the order of the milk control board, hereinafter referred to as the board, dated April 7, 1941, is illegal for that the board was without lawful authority to make it.

It appears from the record that the Swanton market area formerly included that part of the incorporated village of Swanton over which there was free delivery of mail, excluding R.F.D. routes. On January 15, 1941, by an order of that date made after hearing on a petition presented by dealers furnishing more than 70% of milk used in that territory, the board enlarged this market area so as to include the territory for a distance of two miles westerly and two miles southerly of the Swanton post office and to the Highgate line on the north and east. A short time after the above mentioned order was promulgated, several citizens residing in this area brought their petition to the board asking for the abolishment and disestablishment of the Swanton milk area over which the board exercised jurisdiction by maintaining a schedule of prices to be paid for milk and cream therein.

This petition was considered by the board at a hearing in Swanton held March 27, 1941. The Vermont Milk Producers Association and three milk dealers in the Swanton area appeared to oppose the granting of this petition. It also appears from the record that the board at this time "under the authority granted to it by No. 99 of the Public Acts of 1937, on its own initiative, was desirous of inquiring into all and singular the matters of production, distribution and sale of milk insofar as the public health may be menaced, jeopardized or likely to be impaired or deteriorated by the loss or substantial lessening of the supply of milk and cream of the proper quality in the so-called Swanton market."

Findings of fact were made and an order fixing prices for milk and cream in that area was issued by the board April 7, 1941. The questions presented for our consideration are concerned with numbers one and two of these findings, which are as follows:

"1. That the public health is menaced, jeopardized and likely to be impaired and deteriorated by the loss or substantial lessening of the supply of

milk of proper quality in the Swanton area and that the milk control board should continue its supervision of said market area.

"2. And it is further found that the prices hereinafter fixed for milk sold in the Swanton market area, to wit: THE INCORPORATED VILLAGE OF SWANTON to be paid producers by distributors, and the price to be paid by consumers, as long as the aforesaid condition is found to prevail in such market, will best protect the milk industry in the state and insure a sufficient quantity of pure and wholesome milk to adults and minors in the state and in said market area, and will best promote the public interest."

After making the above findings the board issued an order fixing prices to be paid for milk and cream in that area.

The petitioners contend that these findings are wholly without supporting evidence and are based upon mere conjecture, assumptions and speculation and not upon evidence or inferences which could be drawn from any evidence introduced at the trial.

They also insist that because the findings and order are without supporting evidence said order, including the schedule of prices contained therein, is unlawful and is also unreasonable because it works a hardship on the underprivileged class of people in this district, in that it prevents them from buying milk at a price which they can afford to pay.

The questions raised here have to do with the construction of section 5 of No. 99 of the Acts of 1937, which so far as here material is as follows:

"Whenever the board shall determine, either upon complaint or upon its own initiative, after public notice and hearing, that the public health is menaced, jeopardized or likely to be impaired or deteriorated by the loss or substantial lessening of the supply of milk of proper quality in a specified market, the board shall fix the just reasonable minimum or maximum price, or both, that shall be paid producers or associations of producers by distrib-

utors, and the manner of payment, and the prices charged consumers and others for milk by distributors, as long as such condition is found to prevail in such market. * * *''

The petitioners claim that before the board could lawfully promulgate a schedule of prices for milk and cream in that area they must first have found two facts reasonably established by the evidence, namely: 1. That prior to the time of the hearing a loss or substantial lessening of the supply of milk of proper quality had actually taken place there. 2. That the public health was menaced, jeopardized or likely to be impaired or deteriorated thereby.

The petitionees on the other hand contend that all that was necessary to give the board authority to promulgate the order in question was a finding upon proper evidence that a loss or substantial lessening of the supply of milk of proper quality was likely to occur there and for that reason the public health was likely to be impaired or deteriorated.

Which of these contentions is correct can be determined by a consideration of the first section of this act which is as follows:

''Section 1. *General policy of act.* It is hereby declared that the production and distribution of milk is an industry of the state affected with a paramount public interest, in that the health of the public, and especially of infants and children, imperatively requires an uninterrupted continuance of an abundant supply of pure milk; that due to certain unfair, unjust, destructive and demoralizing trade practices carried on by those engaged in the production, sale and distribution of milk for human food, which are likely to result in the undermining of health regulations and standards, the dairy industry and the constant supply of pure milk to the inhabitants of the state are imperiled, and such conditions are a menace to the health, welfare and reasonable comfort of the inhabitants of the state. The general purpose of this act is to protect and promote the public welfare by insuring at all times an adequate supply of clean and pure milk and

cream of proper quality to meet the needs of the inhabitants of this state, and to regulate the milk-marketing industry, and to control in general all milk sold or offered or exposed for sale to the inhabitants of this state, to the end that the public health shall not be menaced or jeopardized.''

■ Here the Legislature first declares that the production and distribution of milk is a matter of paramount public interest because public health requires an uninterrupted and abundant supply of pure milk. Next it is declared that those engaged in the milk business are carrying on certain improper trade practices ''which are likely to result in an undermining of health regulations and standards, * * *.'' This is in effect a declaration that the aforementioned improper trade practices are likely to result in a loss or substantial lessening of the supply of milk of proper quality. Unless this is true, these practices could not be likely to result in the undermining of health regulations and standards. That is, these practices can be likely to undermine health regulations and standards only by first causing a loss or substantial lessening of the supply of milk of proper quality. Therefore, in effect, in this first section the Legislature declared that improper trade practices carried on by those engaged in the business of producing and distributing milk for human food were likely to result in a loss or substantial lessening of the supply of milk of proper quality and that public health was thereby likely to be impaired or deteriorated. These conditions are found to exist throughout the state.

The existence of these conditions as declared in this first section was a primary ground upon which this act was held to be constitutional in the case of *State* v. *Auclair,* 110 Vt. 147, 158, 159, 4 Atl. 2d. 107.

■ It appears from the foregoing that the finding merely that a loss or substantial lessening of a supply of milk of proper quality in a specified area is likely to occur and that thereby the public health is likely to be impaired or deteriorated is but a mere recital that there is present in such area a condition which the legislature has already found to exist not only there but also in all other parts of the state.

It is also significant that in this section 5 the word ''loss''

is preceded by the definite article "the" instead of the indefinite article "a." Apparently what is referred to here is the definite loss which has occurred rather than an indefinite loss which may occur.

Construction of a statute which leads to absurd consequences must always be avoided if possible. *State Highway Board* v. *Gates,* 110 Vt. 67, 72, 1 Atl. 2d. 825; *Brammall* v. *Larose,* 105 Vt. 345, 350, 165 Atl. 916.

While in section 1 of the act it is stated that its general purpose is to control in general all milk sold or offered for sale to the inhabitants of this state, this must be considered in connection with the last sentence in section 4 of this same act. In the latter section, after specifying the duties of the board, it is stated: "The authority herein conferred shall supplement and be in addition to but not in lieu of existing laws relating to the transportation of milk, its inspection and testing, the powers of the state board of health and local health ordinances and regulations as now provided by law."

Although in the last quoted sentence are the words "* * * as now provided by law," it appears that this act No. 99 bears the same relation to No. 209 of the Acts of 1939 as it did to P. L. sections 7731 to 7737, both inclusive, which were in force at the time this No. 99 was enacted, for the following reasons. These sections of the public laws and this Act No. 209 both relate to the same matter, namely, the sale of milk and cream. These sections of the Public Laws were repealed by this No. 209, which, as amended by No. 176 of the Acts of 1941 in certain respects not here material, now stands in lieu of such sections. It is to be presumed that the Legislature in enacting this No. 209 acted with full knowledge of prior legislation on the same subject. *Scott* v. *St. Johnsbury Academy and Trustee,* 86 Vt. 172, 175, 84 Atl. 567, and authorities there cited. Both No. 99 of the Acts of 1937 and No. 209 of the Acts of 1939 deal with the matter of the sale of milk to the inhabitants of this state and being *in pari materia* they are to be construed together as parts of one system. *Newman* v. *Garfield,* 93 Vt. 16, 18, 104 Atl. 881, 5 A. L. R. 1507; *State* v. *Baldwin,* 109 Vt. 143, 148, 194 Atl. 372.

From the foregoing it appears and therefore we hold that before the board can lawfully establish prices to be paid

for milk or cream in any specified market area, it must first find from competent and proper evidence that there has occurred in such area a loss or substantial lessening of the supply of milk of proper quality and thereby the public health is menaced or jeopardized or is thereby likely to be impaired or deteriorated. When these facts have been so found the board shall fix reasonable maximum or minimum prices or both to be paid for milk in such area. This authority shall remain with the board as long as the condition which brought about such loss or substantial lessening of the supply of milk of proper quality is found to prevail in such market. Sec. 5 of No. 99 of the Acts of 1937.

 The statements in the findings here in question as to a loss or a substantial lessening of the supply of milk of the proper quality in the Swanton area are practically in the language used in section 5 of No. 99 of the Acts of 1937. For this reason and also because of the provisions in section 23 of that act specifying that all findings of the board upon questions properly before it shall be deemed to be *prima facie* lawful and reasonable, we construe these findings to be a determination by the board that at the time in question a loss or substantial lessening of the supply of milk of proper quality had actually taken place in the Swanton area. Therefore, we come to the question whether these findings so construed are supported by the evidence.

While the petitionees point to no such evidence, it must be remembered that the board on its own motion is here inquiring into these matters.

An examination of the transcript shows the following undisputed evidence upon this question.

There are about 200 families in this area which may be classed as underprivileged. In most of these the father is the main support and earns from $11. to $15. per week. While in some of these families there are eight or nine children, the average number of persons in each is about six.

Swanton is located in a milk producing section. Most of this milk except what is used for local consumption is taken to a creamery and shipped from there to the Boston market. The milk taken to this creamery is produced under certain rules and regulations as to inspection, etc., which are in force for the purpose of making it suitable for human consumption.

During most if not all of the year prior to January 15, 1941,

milk delivered at the creamery had brought its owner less than 5¢ per quart. There were several farmers in this area who were willing to sell such milk to those who would come to their farms after it for 5¢ or 6¢ per quart. Many of the families above mentioned were getting such milk at those prices prior to January 15, 1941. When the order of that date went into effect this supply of milk at those prices was thereby made unavailable to them. They must now pay for milk 2¢ or 3¢ per quart more than they were paying prior to the order of January 15, 1941, or go outside of the market area to get it. To do this required travelling so far that in most instances it was not practical to do so.

The result is that the amount of milk these families are able to obtain was cut down and in some cases this caused real hardship. While some attempted to offset this by the use of evaporated or condensed milk, these are not as good for food purposes as fresh milk of proper quality.

While there was a considerable evidence introduced to the effect that milk is easily contaminated and in such condition may spread various diseases and that the production of clean milk proper for human use requires a great deal of care, yet the transcript shows no evidence to the effect that the milk which these families were obtaining for 5¢ or 6¢ per quart prior to the time the order of January 15, 1941, went into effect was not of proper quality and in every way fit for human consumption. In fact, the evidence is contra to this.

All of the evidence material on this issue supports the plaintiffs' contention that there had been no loss or substantial lessening of the supply of milk of the proper quality in the Swanton area at any time here material. The order of January 15, 1941, raised milk prices in the new market area to the same level they had been in the old market area. After this order went into effect and at the time of the hearing in this case, the supply of milk there remained as ample as it had been before, but because of a considerable increase in price brought about by the effect of this order many families there were forced to get along with a reduced and insufficient milk supply. In short, the order in question is producing in the Swanton area the very result that it was calculated to prevent.

From the foregoing it follows that the order of the milk

control board issued on April 7, 1941, purporting to fix and establish a schedule of prices to be paid for milk in the Swanton market area is unlawful in that it was issued without due authority of law. Therefore,

*This said order is set aside, vacated and held for naught. To be certified to the milk control board.*