2013 VT 84

## Gillian Franks v. Town of Essex

## Rockingham Area Community Land Trust v. Town of Rockingham

[87 A.3d 418]

Nos. 11-359 & 12-258

Present: Reiber, C.J., Skoglund, Burgess and Robinson, JJ., and Zonay, Supr. J., Specially Assigned

Opinion Filed September 27, 2013

*Rebecca E. Boucher, Brian S. Dunkiel,* and *Geoffrey H. Hand* of *Dunkiel Saunders Elliott Raubvogel & Hand PLLC,* Burlington, for Plaintiff-Appellant. (2011-359)

*William F. Ellis* of *McNeil, Leddy & Sheahan, P.C.,* Burlington, for Defendant-Appellee. (2011-359)

*Robert A. Gensburg* of *Gensburg, Atwell and Greaves, PLLC*, St. Johnsbury, for Plaintiff-Appellee. (2012-258)

*William F. Ellis* and *Kevin J. Coyle* of *McNeil, Leddy & Sheahan, P.C.*, Burlington, for Defendant-Appellant. (2012-258)

*James W. Barlow*, Vermont League of Cities and Towns, Montpelier, for Amici Curiae Vermont League of Cities and Towns and Vermont Assessors and Listers Association. (2011-359 & 2012-258)

¶ 1. **Reiber, C.J.** These cases raise the question of how nonrental residential properties subject to housing-subsidy covenants should be valued for property-tax purposes. Taxpayers in both cases contend that the governing statute mandates an automatic reduction in valuation for properties subject to these covenants or, what is effectively equivalent, a mandatory tax exemption on a portion of the property's value. The towns in which these properties are located contend instead that the statute, 32 V.S.A. § 3481, requires that municipal listers give individualized consideration to the effect, if any, these covenants may have on the fair market value of a given property when they determine the appropriate assessed value for the allocation of property taxes. The Vermont League of Cities and Towns and the Vermont Assessors and Listers Association join the towns as amici curiae. We agree with the towns that the existence of a housing-subsidy covenant is but one of myriad factors listers and assessors must take under advisement in ascertaining a property's fair market value.

¶ 2. In the first of these two cases, *Franks v. Town of Essex*, taxpayer Gillian Franks (Franks) owns an affordable-housing unit in the Town of Essex that is subject to a housing-subsidy covenant. After taxpayer appealed the assessed value of the unit, the state appraiser concluded that the mere existence of a housing-subsidy covenant does not automatically lower a property's fair market value,[1] and found that in this specific case, the covenant did not, in fact, negatively affect the property's value. Taxpayer appealed the state appraiser's decision to this Court.

---

[1] Section 3481 of Title 32 provides in relevant part: "Those elements [that combine to give property a market value] shall include a consideration of a decrease in value in nonrental residential property due to a housing subsidy covenant as defined in section 610 of Title 27 . . . ." 32 V.S.A. § 3481(1).

¶ 3. In the second case, *Rockingham Area Community Land Trust v. Town of Rockingham*, taxpayer Kathleen Margaret (Margaret) owns a house subject to a housing-subsidy covenant granting the land trust a ninety-day purchase option and ostensibly capping the amount she will receive upon the sale of her home to her original contribution, plus twenty-five percent of its appreciation and capital improvements. The house sits on land owned by the trust, which leases the land to Margaret. Under the terms of the ninety-nine-year lease, Margaret agreed to pay all property taxes assessed on the land and house. After the trust grieved the assessed value of the house and land on Margaret's behalf, the state appraiser in this second case eventually concluded that, by law, housing-subsidy covenants automatically decrease a property's value. The state appraiser then reduced the assessed value to a figure that appears to correspond to the property's prior-year assessment, although the appraiser did not explain the calculation's basis. The Town appealed the state appraiser's determination to this Court.

¶ 4. ■ We hold that the statute does not compel a so-called automatic reduction in property tax valuation for all parcels subject to a housing-subsidy covenant, but instead demands an individualized consideration of the effect a particular covenant has on a property's fair market value. For the reasons that follow, we affirm the state appraiser's determination in *Franks* but reverse the appraiser's decision in *Rockingham*, remanding the latter case for consideration of the property's value in light of our holding.

I.

¶ 5. ■ Central to both these appeals is the meaning of our property-valuation statute. Taxpayers in both cases contend that the unambiguous statutory language of 32 V.S.A. § 3481 requires a decrease in the fair market value of a taxpayer's property if it is subject to a housing-subsidy covenant. Vermont employs an ad valorem system for the taxation of property. That is to say, property is taxed in accordance with its actual value. "The property taxation statute requires the listed value of real property to be equal to its appraisal value, which in turn must reflect its estimated fair market value." *Barrett v. Town of Warren*, 2005 VT 107, ¶ 6, 179 Vt. 134, 892 A.2d 152 (citing 32 V.S.A. § 3481(1)-(2)). In Vermont, then, property is taxed in accordance with its fair

market value and not based upon an owner's equity. A property's estimated fair market value is defined by statute as "the price which the property will bring in the market when offered for sale and purchased by another, taking into consideration all the elements of the availability of the property, its use both potential and prospective, any functional deficiencies, and all other elements such as age and condition which combine to give property a market value." 32 V.S.A. § 3481(1).

¶ 6. ■ Since 1997, the municipal listers and assessors who determine property-tax valuations have been specifically required to include in this calculation "a consideration of a decrease in value in nonrental residential property due to a housing subsidy covenant." *Id.*; 1997, No. 60, § 64. These covenants — designed to help maintain affordable housing — may include, among other things, restrictions on use, resale price, tenant income and rents, as well as limitations on the income of a purchaser of a housing unit for his or her own residence. See 27 V.S.A. § 610(b). The covenants are generally executed by lower-income homebuyers as a condition for the receipt of a purchase subsidy from the Vermont Housing and Conservation Board (VHCB) or its non-profit partners, whose bylaws require that the subject housing be maintained as affordable housing on a perpetual basis. See 10 V.S.A. §§ 303(3)-(4), 321(a)(1).

¶ 7. Taxpayers in both cases maintain that the housing-subsidy-covenant "consideration" language in the property-tax-valuation statute requires listers to presume an automatic decrease in a property's value based on the mere existence of a covenant of this type. Although deference to the state appraisers' legal interpretation of 32 V.S.A. § 3481(1) is generally appropriate, it does not resolve this matter because two appraisers arrived at conflicting interpretations of the statute. *Barrett*, 2005 VT 107, ¶ 5 (Court will generally uphold state appraiser's legal interpretation of § 3481(1) absent a compelling indication of error).

¶ 8. ■ We begin by observing that on all issues of statutory interpretation we presume the Legislature intends the plain and ordinary meaning of a statute. *Pease v. Windsor Dev. Review Bd.*, 2011 VT 103, ¶ 17, 190 Vt. 639, 35 A.3d 1019 (mem.). Here, the statute imposes a duty on municipal listers to include "a *consideration* of a decrease in value" from a qualifying housing-subsidy covenant. See 32 V.S.A. § 3481(1) (emphasis added). Words that

are not defined within a statute are given their plain and ordinary meaning, which may be obtained by resorting to dictionary definitions. *Pease*, 2011 VT 103, ¶ 17. To "consider" generally means "to think about with care or caution," while "consideration" is "continuous and careful thought" or "a taking into account." Webster's New Collegiate Dictionary 241-42 (1977). Other definitions we have consulted do not deviate from this general understanding. See, e.g., Webster's International Dictionary 569 (2d ed. 1961) (defining the noun "consideration" principally as: "observation; contemplation," "[the] [a]ct or process of considering continuous and careful thought; examination; deliberation; attention," "[t]houghtful or sympathetic regard or notice," and "[t]hat which is, or should be, considered as a ground of opinion or action . . . ."); Black's Law Dictionary 277 (5th ed. 1979) (defining the verb "consider" as "to fix the mind on, with a view to careful examination; to examine; to inspect. [t]o deliberate about and ponder over. [t]o entertain or give heed to."). Based on these definitions, a lister or assessor must give thought to and take into account a potential decrease in value as a result of a covenant. The very act of taking something under advisement in this manner does not suggest the sort of specific, preordained outcome of an automatic decrease in valuation.

¶ 9. ▮ Nothing in the statutory language suggests its drafters intended an interpretation that contradicts the plain meaning of "consideration" by imposing a rote reduction in assessed value for all properties subject to a housing-subsidy covenant. First, the drafters' use of an indefinite article to describe any decrease in value attributable to a housing-subsidy covenant supports this conclusion. In describing the type of decrease for which listers must include consideration, the statute employs the indefinite article "a" — as in "a decrease" — which indicates that there may or may not be a reduction in value, instead of the definite article "the," which would imply that the presence of a covenant necessarily reduces value. Cf. *In re Swanton Mkt. Area*, 112 Vt. 285, 291-92, 23 A.2d 536, 538 (1942) (distinguishing between "a loss" and "the loss," and concluding latter phrase means "the definite loss which has occurred rather than an indefinite loss which may occur"). Second, even if the property-taxation statute could be understood to mandate a so-called automatic decrease in assessed value, its interaction with the housing-subsidy-covenant statute would leave unanswered the more vexing question of the amount

by which to reduce a nominally restricted property's value. Taxpayers' interpretation would, in effect, mandate an automatic valuation decrease of an indeterminate amount. In cases where market evidence and analyses found absolutely no reduction in value, listers would face the unenviable task of reconciling an "automatic decrease" with the need to assign a value reflecting actual data. This is precisely the sort of absurd result we seek to avoid when interpreting statutes. See *Shlansky v. City of Burlington*, 2010 VT 90, ¶ 8, 188 Vt. 470, 13 A.3d 1075 ("In looking to the statutory language as an expression of legislative intent, we presume the Legislature intended an interpretation that furthers fair, rational consequences, and not one that would lead to absurd or irrational consequences." (quotation omitted)).

¶ 10. ■ From a public-policy standpoint, an individualized consideration is particularly important given the fact that not all housing-subsidy covenants are built alike. Great variation in their terms is permissible, and this variety could easily yield divergent market effects. See 27 V.S.A. § 610(b) (containing nonexhaustive list of restrictions and noting that covenants may be perpetual or time limited). Although the covenants "run with the land," *id.* § 610(e), they "may be amended or terminated by written agreement of the owner of the land and all persons or entities holding the right to enforce the covenant." *Id.* § 610(d). Either the subsidy's provider or a state-designated affordable-housing organ or nonprofit corporation to whom the right of enforcement has been assigned may enforce the covenants. *Id.* § 610(e). As illustrated by the record in both of these cases, the housing-subsidy covenants are frequently terminated by consent. The language in the *Rockingham* property covenant imposes no limitation on the ability of the parties — the taxpayer and the land trust — to terminate the restriction. The land trust involved in the *Rockingham* property can, in fact, extinguish the covenant through purchase, foreclosure or by agreement. Without individualized analysis of a covenant's specific terms and the market context — an inquiry that may well discern no difference in estimated fair market value between the nominally restricted subject property and other unencumbered properties — the concept of a so-called automatic decrease would be meaningless.

¶ 11. Taxpayers cite *Prowitz v. Ridgefield Park Village*, 568 A.2d 114 (N.J. Super. Ct. App. Div. 1989), for the proposition that automatic decrease in assessed value is required. We find their

argument unpersuasive. To begin with, the Appellate Division of the New Jersey Superior Court remanded that case for a consideration of the extent to which restrictive covenants affected the subject property's tax valuation. *Id.* at 119 (remanding for effect of restriction to be taken "into account"). The court did not specify an automatic decrease, but instead mandated precisely the type of consideration we have said our statute commands. Furthermore, several salient distinctions convince us that *Prowitz* differs materially from the present case. First, the *Prowitz* court noted that municipal appraisers should assess neither the value transferred through an easement appurtenant to a dominant parcel, which enjoys a corresponding increase in value, nor the value transferred to the public more generally through an easement in gross. *Id.* at 117. The court also observed that "the whole gamut of governmental regulation imposing like restraints" exerts a "depreciating effect on value." *Id.* at 118. Here, no such shift of value occurred, nor does governmental regulation for the public good categorically and perpetually reduce the properties' fair market values. Although the *Prowitz* court spoke in glowing terms of the indisputable social good and public benefit of maintaining affordable housing, the court's reasoning, in fact, relied heavily on the existence of a statewide statutory obligation to provide a certain quantity of affordable housing within each jurisdiction. See *id.* ("[T]he provision of a fair share of affordable housing is, by reason of the Fair Housing Act, a municipal obligation imposed by statute."). These restrictions helped the municipality in achieving its legally mandated lower-income-housing requirements, in effect offering a quid pro quo for the corresponding decrease in the municipal tax base.

¶ 12. ▮▮ ▮▮ It does not appear from the statutory language that the Legislature intended to impose such a laudable-but-sweeping requirement on Vermont municipalities.[2] Rather, the State created

---

[2] We note also that the Legislature knows how to mandate a specific method of appraisal if it wishes to do so. "We have repeatedly held that when the Legislature wishes to achieve a particular result, and shows that it knows how to do so, the failure to do so in a particular case will be respected." *Congdon v. Taggart Bros., Inc.*, 153 Vt. 324, 326-27, 571 A.2d 656, 658 (1989). In the statute, the Legislature has laid out a method for determining fair market value of residential rental property, mandating that "fair market value shall be determined by an income approach using" market rents with utility allowance adjustments, actual expenses incurred with respect to the property, a vacancy rate that is fifty percent of the

a program to facilitate lower-income home ownership by making provision for grants to eligible buyers to help defray the purchase cost. The regime seeks to restrain the future price of the same properties by requiring owners in most cases to forego a portion of a home's regular market appreciation pursuant to a housing-subsidy covenant. In enacting amendments to the property-tax statute, the Legislature required listers to be mindful of the potential market impact of the housing-subsidy covenants that often accompany these grants. In doing so, however, the Legislature did not impose an affirmative duty on all town residents to personally subsidize these properties at the local level by forcing neighbors to shoulder a disproportionate share of the cost of education and municipal services. Yet this is precisely the interpretation urged by taxpayers in both cases. We therefore hold that the statute as written does not require the imposition of an automatic reduction in a property's valuation.

## II.

¶ 13. There remains the more fact-intensive question of whether the assessors and listers in these cases properly considered the effect, if any, of these covenants.

## A. Franks

¶ 14. ▮ Franks contends that, even if the property-taxation statute does not mandate an automatic decrease in valuation, the state appraiser abused his discretion in failing to defer to the methodology contained in a memorandum authored by the Director of the Division of Property Valuation and Review (PVR). Franks urges this Court to defer to the memorandum's methodology rather than the state appraiser. Franks maintains that the evidence does not support the state appraiser's finding that the housing-subsidy covenant resulted in no decrease in fair market value.[3] We conclude that the state appraiser's valuation was

---

market vacancy rate, and a capitalization rate that is typical for the geographic area. 32 V.S.A. § 3481(1)(A)-(D). By contrast, regarding nonrental residential property, the Legislature chose the phrase "[t]hose elements [that combine to give property a market value] shall include a consideration of a decrease in value . . . due to a housing subsidy covenant." *Id.* § 3481(1).

[3] Franks argues for the first time on appeal that the state appraiser's interpretation of § 3481 violates the Proportional Contribution Clause of the Vermont Constitution because similarly situated taxpayers would be treated arbitrarily and

reasonably drawn from the evidence, and that the state appraiser correctly understood the issue presented.

¶ 15. Franks bought the subject property in 2003 with the assistance of grants from Champlain Housing Trust (CHT), which is one of the entities to which VHCB makes housing-subsidy grants pursuant to its statutory authority.[4] At the time, the property was valued at $130,000. Franks paid $81,250 and financed the remainder with grants of $48,750 from the housing trust and VHCB. She signed a covenant in which she agreed that, at resale, she would receive full credit for her capital improvements, plus twenty-five percent of appreciation. More specifically, the covenant provides that if Franks desires to sell the property, she must provide written notice to CHT and an appraisal must be performed. After completion of the appraisal, CHT has 180 days to locate an eligible buyer. If CHT locates an eligible buyer, taxpayer must sell the property to CHT for the "option price." The "option price" is the owner's original purchase price, plus any capital improvement credits, plus the owner's twenty-five percent appreciation share, minus the grants provided by CHT and VHCB.[5] The new buyer's net purchase price is the option price plus CHT's six percent fee. If CHT cannot locate an eligible buyer within 180 days, taxpayer may sell the property to any purchaser, provided that she repays the principal amount of the grants plus fifty percent of any increase in appreciation resulting from the conveyance.

¶ 16. In 2010, the Town assessed the value of Franks' property at $173,900. Franks appealed this assessment to the Town's Board of Civil Authority, which affirmed the Town's valuation. Franks then appealed to the state appraiser. Franks argued that the Town improperly valued her home as if there were no covenant. That is to say, she claimed the Town treated the property as if she paid $130,000 in 2003, could have sold it for $173,900 in 2010, and could claim the full appreciation upon resale. She argued that

inequitably. Taxpayer did not raise this argument below, and we therefore do not address it on appeal. See *Garilli v. Town of Waitsfield*, 2008 VT 91, ¶ 7, 184 Vt. 594, 958 A.2d 1188 (mem.).

[4] The covenant was originally entered into with the Burlington Community Land Trust, which merged with another group in 2006 to form CHT.

[5] Throughout this opinion, the option price is also referred to as the restricted value of the property, while the price paid as reflected on the Property Transfer Tax Return (PTTR) is referred to as the unrestricted value.

it is unfair to tax her on the unrestricted value of her home because that value does not reflect the restrictions contained in the covenant. She cited a Department of Taxes memorandum authored by the PVR in support of her argument. The memorandum suggests valuing homes encumbered by housing-subsidy covenants by using the new buyer's net purchase price, which is the option price plus a transaction fee. The Town argued that the assessor considered the existence of the housing-subsidy covenant, and that he found "no market evidence to suggest that the existence of the covenant had any impact on value."

¶ 17. The state appraiser found that listers and assessors in some municipalities have determined that such covenants reduce properties' fair market value, while others have determined they do not. For example, the City of Burlington applies an across-the-board reduction in property-tax bills for CHT homes. The state appraiser, however, did not interpret 32 V.S.A. § 3481 to require assessors to automatically lower fair market value or the listed value for property subject to a housing-subsidy covenant. Although such covenants must be "considered" by assessors pursuant to § 3481, the state appraiser said, comparable-sales data are needed to determine if the fair market value is in fact affected. Taxpayer presented evidence in support of her argument for a lower-listed value, but she did not present comparable-sales properties or other market evidence that the covenant affected the fair market value. Thus, the state appraiser found the best estimate of fair market value to be $174,300. Applying an equalization ratio of 99.79%, the state appraiser found the listed value of the property to be $173,900. The state appraiser did not defer to the PVR memorandum, reasoning that the methodology contained therein is only used as guidance if the assessor finds a decrease in value because of a housing subsidy covenant, and here, there was no such decrease.

1.

¶ 18. We reject the suggestion that we must defer to the PVR memorandum for several reasons. First, we defer only when there can be some legitimate dispute as to the meaning of the language in the statute the agency is charged with executing. We will not interpret statutory language in a manner at odds with the statute's language merely because it comes from someone within the agency charged with implementation. Even if we did defer to

the memorandum at issue here, the document's language compels an outcome diametrically opposed to Franks' argument. The PVR memorandum specifically states that it "outlines a uniform approach that local listers *can* employ for determining the listed value of owner-occupied homes subject to [housing subsidy covenants]" (emphasis added). It goes on to suggest a valuation approach, and that if an assessor chooses to use the valuation approach, he or she must work with the nonprofit and homeowner. Finally, citing § 3481, it notes that "Vermont law requires local assessment officials to consider the effect of this type of resale restriction when valuing this type of property."

¶ 19. Deference to the PVR director is unnecessary here because the memorandum merely suggests a methodology to be used in valuing covenant-restricted properties. The memorandum restates the statutory language that a covenant must be considered. The memorandum specifically leaves the choice of whether to use its methodology up to the assessor. Thus, the state appraiser did not abuse his discretion in declining to follow the suggestion in the memorandum, and we decline to defer to the PVR director on appeal.[6]

2.

¶ 20. Franks next argues that the record does not support the state appraiser's finding that the town assessor considered the impact of the covenant on the fair market value of the property. Franks also contends that the state appraiser's reliance on the town assessor's compiled list of ten condominiums sold in 2009 and 2010 was erroneous. Franks argues specifically that the list compares the sale of one home subject to a covenant to a number of homes not subject to covenants, and thus no comparable sales were used. She also maintains that the town assessor's use of the prices paid for real property found on PTTRs was erroneous because those numbers include the grants provided by CHT, and taxpayer cannot realize that amount as equity in the property. Finally, she contends that the one home subject to a covenant was assessed without taking the covenant into account.

---

[6] On January 3, 2012, a technical bulletin was issued by the Vermont Department of Taxes. The technical bulletin, like the PVR memorandum, "outlines a uniform approach that local listers *can* employ for determining the listed value of owner-occupied homes subject to resale restrictions as defined in 27 V.S.A. § 610" (emphasis added). Because the bulletin was issued after the hearing and issuance of the state appraiser's decision, we do not consider it on appeal.

¶ 21. The state appraiser found that the town assessor took into consideration the housing-subsidy covenant, and that there was no decrease in value. Specifically, the state appraiser found that taxpayer presented evidence sufficient to rebut the presumption of the validity of the town assessor's appraisal. However, he concluded that the price paid as reflected on a PTTR generally represents fair market value, and that the new buyer's net purchase price is obviously lower than that on the PTTR because CHT subsidizes a portion of the cost. The state appraiser found that the CHT grant is akin to a zero-percent second mortgage or owner-financing that CHT recovers when the property is resold.

¶ 22. Before turning to Franks' specific allegations of error, we emphasize the limited nature of our review on this factual issue. We defer to the state appraiser when the findings are supported by the record. *Lake Morey Inn Golf Resort, Ltd. P'ship v. Town of Fairlee*, 167 Vt. 245, 248, 704 A.2d 785, 787 (1997). Thus, if there is some basis in evidence for the valuation, in order to prevail the taxpayer must demonstrate that the state appraiser's exercise of discretion was clearly erroneous. *Id.* We will uphold the state appraiser's findings if they are rationally drawn from the evidence. *Allen v. Town of W. Windsor*, 2004 VT 51, ¶ 4, 177 Vt. 1, 852 A.2d 627.

¶ 23. Franks produced evidence, in part through testimony, in support of her arguments. Emily Higgins, the director of the Homeownership Center for CHT, explained generally how the grants work. She also testified that the fair market value of a covenant-restricted home is its restricted value, while the unrestricted value is used as a starting point from which to calculate the option price and the new buyer's net purchase price. John Emmeus Davis, a partner at a consulting cooperative that specializes in affordable housing policy, testified that the resale restrictions imposed by the covenant are a burden on the value of the property. He also testified that the list of condominiums sold in 2009 and 2010 does not demonstrate that the covenant does not impact fair market value because it looks at the unrestricted value, not the restricted value.

¶ 24. The town assessor testified that he took the covenant into consideration, and found no evidence that the covenant reduced the value of the property. He also testified that the covenant dictates the option price at which the owner must sell the property back to CHT, and the amount of equity the owner may

realize upon sale, but that the covenant did not, in this case, affect the value of the property. The town assessor testified that he looked to 2009 and 2010 sales of condominiums in Essex, one of which was subject to a housing-subsidy covenant. Analyzing those sales, using the price paid for the property on the PTTR, he found no reduction in Franks' property's value.

¶ 25. Michael Mahoney, a real estate appraiser, testified that such covenants do not necessarily require a decrease in listed value, because the price at which someone sells or buys properties encumbered by such covenants is not always a reflection of the value of those properties. He testified that the restricted price is not arrived at by way of an arms-length transaction because it is the result of a contractual arrangement between the owner and CHT. The covenants affect the net amount that sellers receive when the property is sold, he said, but the financial assistance provided by CHT in the form of the grant does not actually reduce a property's value. R. Todd LeBlanc, an assessor for the City of South Burlington, testified that he takes into consideration similar covenants, and that there has been no effect on fair market value. He testified that the covenants are essentially "back end loaded mortgages," wherein CHT provides financial assistance in the form of grants, and upon resale, the grants plus seventy-five percent of equity that has accrued is repaid to CHT. He noted that because the City of South Burlington does not adjust the value of property based on the amount of any outstanding liability on the property, there is no basis for adjusting value in cases like this based on the amount of the grant.

¶ 26. Although Franks faults the comparable sales prepared by the town assessor, the burden of persuasion remained with Franks to show that the appraisal did not reflect the fair market value of the property. *Kruse v. Town of Westford*, 145 Vt. 368, 372, 488 A.2d 770, 773 (1985). Franks failed to carry that burden. Importantly, she did not present comparable-sales market evidence to show that the covenant reduced fair market value. Franks' witnesses testified that the covenant affects fair market value and that the restricted value is the property's fair market value. The Town's witnesses testified to the opposite conclusion — that CHT's financial assistance, which must be repaid, does not affect the value of property and that the unrestricted price is the better indicator of fair market value. The state appraiser's findings are supported by the testimony of the Town's witnesses as to the

effect of the covenant. The state appraiser was entitled to find on the basis of the evidence that the unrestricted value was the result of an arms-length transaction, and therefore was a good indicator of fair market value, in contrast to the restricted value. Although the record contains contradictory evidence, we defer to the state appraiser's decision that the unrestricted price reflects fair market value in this case. *Lake Morey Inn Golf Resort*, 167 Vt. at 248, 704 A.2d at 787.

3.

¶ 27. Franks' final contention is that the state appraiser misunderstood the issue presented and predetermined the outcome of this case. At the hearing, the state appraiser stated that the issue to be determined was the listed value of the property, or the amount on which the owner pays taxes. He noted that the fair market value is the value determined by a licensed fee appraiser, and the listed value is determined therefrom. Franks argued that the issue was the fair market value of the home.

¶ 28. This argument merely reveals the parties' use of different terminology, likely originating from the equation of fair market value with listed value in 32 V.S.A. § 3481. As noted, "[t]he property taxation statute requires the listed value of real property to be equal to its appraisal value, which in turn must reflect its estimated fair market value." *Barrett*, 2005 VT 107, ¶ 6 (citing 32 V.S.A. § 3481(1)-(2)). While Franks used the term "fair market value," the state appraiser was using the term "listed value." Despite this difference in terminology, the transcript and the state appraiser's decision reflect that the state appraiser understood the basic issue, which was how Franks' home, subject to a housing-subsidy covenant, should be valued for property tax purposes.

## B. Rockingham Area Community Land Trust

¶ 29. In *Rockingham*, it is the Town that appeals the state appraiser's determination. The relevant facts are as follows. Margaret purchased her three-bedroom ranch house in Bellows Falls in June 2008. The previous owners had sold the property to the land trust for $100,700 and the land trust immediately sold the house to Margaret for $121,000. The land trust provided Margaret with $18,500 of the purchase price in the form of grants. The trust, which through a series of conveyances owns the underlying parcel in fee simple, leased the land to Margaret, who agreed as

part of the accord to pay all ad valorem taxes on the land and house.

¶ 30. As a condition of receiving the purchase grants, Margaret executed a housing-subsidy covenant similar to the covenant to which the previous owners had agreed. By the terms of the covenant, the land trust possesses a ninety-day option to purchase the house for the lesser of the following: (1) the original purchase price of $121,000, minus the $18,500 grant, plus twenty-five percent of any appreciation on the property, plus credit for any capital improvements, or (2) the total appraised value of the property upon notice to sell, minus the $18,500 grant. The covenant contains three provisions for termination: when the land trust executes its purchase options; if Margaret's mortgagees foreclose; or by written agreement between the land trust and Margaret.

¶ 31. In 2010, the town listers set a value of $152,000 for the property. Margaret appealed to the listers but was denied. She then appealed to the Town Board of Civil Authority, which lowered the total assessed value to $143,800. Margaret then appealed to the state appraiser, pursuant to 32 V.S.A. § 4461 et seq. The state appraiser in Margaret's case found that "[n]either party offered any market data or sales to support market value showing that any properties were affected" by the housing-subsidy covenants. The state appraiser nevertheless concluded that the statute required an automatic reduction in listed value, and noted that the Town's 2010 reassessment was not the result of a material change in the property or a town-wide revaluation before setting an April 1, 2010 value of $118,000, which appears to correspond to the prior-year listed value.

¶ 32. The Town appeals the state appraiser's decision, arguing that the state appraiser erred by arbitrarily reducing the assessed value to $118,000 when Margaret had not presented any evidence tending to establish the covenant's purported negative effect on fair market value or the amount of the alleged decrease. Margaret maintains that even without an automatic decrease in value, the state appraiser nonetheless reached the correct result in setting a taxable value of $118,000 because the covenants actually had the effect of reducing the property's value to that amount.

¶ 33. [10] On appeal, "[t]his Court will affirm the State Appraiser's decision as to fair market value if the findings were rationally

drawn from the evidence and were based on a correct interpretation of the law." *Zurn v. City of St. Albans*, 2009 VT 85, ¶ 7, 186 Vt. 575, 980 A.2d 795 (mem.). Here, we conclude that the record lacks the evidentiary support necessary to sustain the appraiser's market-value determination on the basis of the covenant's purported effect. When a taxpayer appeals a town's listing to the state appraiser, the municipality bears the initial burden to produce evidence as to fair market value. *Id.* ¶ 7. A town's valuation enjoys a presumptive validity on appeal to the state appraiser, but the taxpayer may rebut that presumption by producing admissible evidence. *Allen*, 2004 VT 51, ¶ 4. Once the taxpayer produces admissible evidence tending to prove the taxpayer's claim, the town must produce some evidence to justify its appraisal, although the ultimate burden of persuasion remains with the taxpayer. *Kruse*, 145 Vt. at 372, 488 A.2d at 773. As the appraiser observed in his conclusions: "Neither party offered any market data or sales to support market value showing any properties were affected the by [sic] housing covenants." Margaret thus failed to meet her burden of persuasion in her appeal to the state appraiser, and it was an abuse of discretion for the state appraiser to "pick a figure out of thin air." Cf. *Zurn*, 2009 VT 85, ¶ 10 (affirming state appraiser's rejection of discount where taxpayers did "not contest the State Appraiser's findings that they offered no evidence as to what discount would be appropriate"). We therefore reverse the state appraiser's decision and remand.

*The state appraiser's decision in Franks is affirmed; the state appraiser's determination in Rockingham is reversed and remanded for further consideration in light of this holding.*

¶ 34. **Robinson, J.,** dissenting. I agree with the majority's express central holding that 32 V.S.A. § 3481 does not compel an automatic reduction in property tax valuation for all parcels subject to a housing-subsidy covenant but instead demands an individualized consideration of the effect a particular covenant has on a property's fair market value. *Ante*, ¶ 4. But I believe the majority's focus on whether the statute mandates an automatic reduction from the unrestricted fair market value of a property versus individualized consideration of the effect of a covenant obscures the pivotal issue in this case.

¶ 35. The real bone of contention here is whether, in conducting the requisite individualized consideration, an assessor is supposed

to determine the impact of the restriction on the appraised unrestricted market value of the property — which appears as the sale price on the property transfer tax return (PTTR) — or whether the assessor is supposed to figure out what a willing buyer would pay a willing seller for the property subject to all of the covenant restrictions, including the requirement that owner sell the property for what the majority calls "the option price," such that the assessed value of the property does not encompass the additional quantum of market value that the property would have without the restrictions. Put another way, the key·question is: With a home subject to a statutorily qualifying housing-subsidy covenant, is the portion of the unrestricted market value that is essentially "held" by the participating nonprofit or other agency in the form of a grant and/or unrealized appreciation part of the fair market — and thus taxable — value of the property, or is the fair market value of the property in this context defined solely with reference to the value a buyer would pay for the property given the restrictions, including the limits on the proceeds that can be realized by the owner upon resale? I believe this is the question that actually divides the parties and the respective state appraisers. Although the majority does not squarely resolve this fundamentally legal question, I believe it does so implicitly in the context of its evaluation of the evidence in these two cases.

¶ 36. For the reasons set forth below, I conclude that in enacting 32 V.S.A. § 3481 the Legislature adopted the latter approach — that "fair market value" in the context of residential nonrental property subject to restrictive housing-subsidy covenants is calculated with reference to what a willing individual buyer would pay to purchase the property *subject to the applicable restrictions*, considering what that buyer could realize from reselling the property, and without regard to any potential value "held" by the participating nonprofit organization or state agency. Because the state appraiser's analysis in the *Franks* decision is at odds with this approach, I would reverse. The state appraiser's reasoning in the *Rockingham* decision is consistent with the above understanding, but I would remand this case for further explanation of the rationale underlying the state appraiser's specific valuation.

I.

¶ 37. I begin with my reasons for concluding that the statute calls for a determination of the *actual price an individual buyer*

*would pay* to acquire the property subject to the various restrictions, rather than the total potential unrestricted value of the property reflected on the PTTR.

¶ 38. The relevant statute equates "listed value" with the "appraisal value" and provides that, with specified exceptions, "appraisal value" is the property's "fair market value." 32 V.S.A. § 3481. It, in turn, defines "fair market value" as follows:

> The estimated fair market value of a property is the price which the property will bring in the market when offered for sale and purchased by another, taking into consideration all the elements of the availability of the property, its use both potential and prospective, any functional deficiencies, and all other elements such as age and condition which combine to give property a market value. Those elements shall include a consideration of a decrease in value in nonrental residential property due to a housing subsidy covenant as defined in section 610 of Title 27, or the effect of any state or local law or regulation affecting the use of land . . . .

*Id.* The point of this directive is to make it clear that fair market value — and thus appraisal value and ultimately listed value — is not based on the amount a buyer would pay for the property unencumbered by restrictions as to its use or resale but, rather, is based on the real-world amount a buyer would pay a seller for the property given the applicable restrictions. The requirement that an assessor consider the effect of the restrictions on value would make no sense if the touchstone of fair market value was the amount a buyer would · pay for a hypothetical identical property *not* subject to such restrictions. By definition, the restrictions would *never* affect value understood in that way, and consideration of the effect of the restrictions would be pointless. See *In re Jenness*, 2008 VT 117, ¶ 24, 185 Vt. 16, 968 A.2d 316 ("When possible we construe statutes to avoid rendering one part mere surplusage, and we strive to read all parts of the statutory scheme in harmony." (citation omitted)). The Legislature's indication that an appraisal should include "consideration" of the restrictions thus not only requires that the restrictions be a factor in determining "fair market value," but also indicates that the "fair market value" the Legislature has in mind is that applicable to the property *with the restrictions*.

¶ 39. Moreover, the Legislature's instruction that determination of fair market value should include consideration of the housing-subsidy covenants does not stand in isolation; the same provision requires consideration of "the effect of any state or local law or regulation affecting the use of land, including but not limited to chapter 151 of Title 10 or any land capability plan established in furtherance or implementation thereof." 32 V.S.A. § 3481. The way one considers the effect of state land use regulation on the fair market value of the property is to determine what a willing buyer would pay to purchase the property subject to the applicable regulations — not what a willing buyer would pay to purchase the property in the absence of any such regulations. It would be odd to acknowledge that the "consideration" requirement in § 3481 requires that property subject to development restrictions be valued at the price a buyer would pay to take the property subject to those restrictions, but then to suggest that the same "consideration" requirement has a different meaning with respect to the housing-subsidy covenant restrictions. *Vermont Golf Ass'n v. Dep't of Taxes*, 2012 VT 68, ¶ 30, 192 Vt. 224, 57 A.3d 707 (Robinson, J., concurring) ("In order to determine the intent of the Legislature, we must examine and consider fairly, not just isolated sentences or phrases, but the whole and every part of the statute, . . . together with other statutes standing . . . as parts of a unified statutory system." (quotation omitted)).

¶ 40. I do not contend that the words of the statute on their face mandate that the fair market value of covenant-restricted property "automatically" be pegged at a level lower than the fair market value of otherwise identical property not subject to the covenants (i.e., the amount listed on the PTTR). The impact of the covenant on the actual fair market value of the property as compared to the fair market value of a hypothetical identical unrestricted property will depend on the specific requirements of the covenant in question as well as the prevailing market conditions. I can imagine a scenario in which the impact of a covenant on the actual fair market value of the property might be modest — such as a falling housing market in which the inability of a prospective purchaser to capture all of the future appreciation in a property does not substantially suppress the price that a buyer would be willing to pay for property subject to minor resale restrictions. But the statute does reflect a recognition that in the vast majority of cases a buyer would pay less for a property that

is subject to legal restrictions — whether they be on use, development, or resale — than for an identical property without such restrictions. The statute does not require an "automatic" reduction in the value of property subject to the covenants relative to the unrestricted value reflected on the PTTR, but the individualized consideration required by the statute will necessarily lead to some reduction in value in the overwhelming majority of cases.

¶ 41. This interpretation not only best matches the language and structure of § 3481, it also best promotes the goals of Vermont's statutory scheme. *Am. Museum of Fly Fishing, Inc. v. Town of Manchester*, 151 Vt. 103, 108, 557 A.2d 900, 903 (1989) ("In interpreting a statute, legislative intent should be gathered from a consideration of the whole and every part of the statute, the subject matter, the effects and consequences, and the reason and spirit of the law." (quotation omitted)). The Legislature created the Vermont Housing and Conservation Trust Fund, administered by the Vermont Housing and Conservation Board (VHCB) for the express purpose, among others, of encouraging and assisting in creating affordable housing. 10 V.S.A. § 302(b). In fulfilling its statutory mandate, the VHCB makes grants to entities dedicated to creating or retaining affordable housing for lower income Vermonters, provided the bylaws of those entities require that such housing be maintained as affordable housing on a perpetual basis. 10 V.S.A. §§ 303(3)(A), 303(4), 321(a)(1). Also in furtherance of its policy promoting affordable housing, the Legislature passed a statute allowing for "housing subsidy covenants" to encourage the development and continued availability of affordable rental and owner-occupied housing for low- and moderate-income people. 27 V.S.A. § 610. The statute allows for the creation of a housing-subsidy covenant as a condition of, among other things, a grant, loan or contract made by a nonprofit corporation or state agency. *Id.* The restrictions built into the covenant may include without limitation restrictions on use, resale price, tenant income and rents, and restrictions on the income of a purchaser of a housing unit for his or her own residence. *Id.* This statute, designed to promote affordable housing, is, in turn, incorporated by reference into the statute governing property taxes that directs that fair market value be determined with consideration of the impact of such restrictions on the amount a buyer would pay. 32 V.S.A. § 3481. We must understand the instruction in § 3481 to "consider" the effect of restrictive covenants with reference to the Legislature's expressed goal of promoting affordable housing.

¶ 42. If the hypothetical unrestricted value of a property were the benchmark for assessing property taxes, rather than the property's actual value to a prospective purchaser given the restrictions on the property, a low-income person who qualifies for and purchases a covenant-restricted home pursuant to a housing subsidy could nonetheless be required to pay property taxes as if that person had purchased an otherwise identical unrestricted property on the open market. That taxpayer would be required to pay taxes at a level commensurate with a property that the low-income, housing-subsidy-eligible taxpayer presumably could not have afforded in the first place. That does not make sense. If a person can be subsidized into an affordable home, but taxed out of it when the first property tax bill comes, then the promise of the housing subsidy programs authorized by the Legislature is chimeric. See *Shlansky v. City of Burlington*, 2010 VT 90, ¶ 8, 188 Vt. 470, 13 A.3d 1075 ("In looking to the statutory language as an expression of legislative intent, we presume the Legislature intended an interpretation that furthers fair, rational consequences, and not one that would lead to absurd or irrational consequences." (quotation and alterations omitted)).

¶ 43. I realize that this means that a quantum of the otherwise-taxable value of a property disappears from the tax rolls when an unrestricted property is subjected to a statutorily compliant affordable housing covenant, and that fellow taxpayers in a town with covenant-restricted affordable housing thus shoulder a higher share of the cost of local government. *Ante*, ¶ 12. That is true, but unremarkable. The Legislature makes policy judgments all the time that affect the way a town can tax property, and thus impact the tax liability of other local taxpayers. For instance, the Legislature exempts from property taxation most property owned by the state and federal governments, chartered veterans organizations, YMCAs and YWCAs, and animal welfare organizations. 32 V.S.A. § 3802(1), (2), (6), (15). It exempts from property taxation real estate used for public, pious or charitable uses, college fraternity houses, cemeteries, the grounds of annual agricultural fairs, qualifying property dedicated to water pollution abatement, qualifying health centers and certain solar power plants. *Id.* § 3802(4), (5), (7), (9), (12), (16), (17). And it has expressly exempted certain disabled veterans and their families from paying property tax on $10,000 of the appraisal value of their homes. *Id.* § 3802(11).

¶ 44. In all of these cases, the Legislature has concluded that the public interest warrants limiting the property taxes a town can collect from certain property owners, thereby forcing municipalities to socialize more of the costs of local government among other property tax payers. The Appellate Division of the New Jersey Superior Court likewise recognized the public benefit of affordable housing legislation in concluding that the taxable fair market value of affordable housing subject to resale restrictions should be determined on the basis of the value of the property subject to the deed restriction. *Prowitz v. Ridgefield Park Vill.*, 568 A.2d 114 (N.J. Super. Ct. App. Div. 1989). The court in that case explained:

> The deed restriction limiting resale price constitutes a patent burden on the value of the property, not on the character, quality or extent of title. It is, moreover, a restriction whose burden on the owner is clearly designed to secure a public benefit of overriding social and economic importance, namely, the maintenance of this State's woefully inadequate inventory of affordable housing.

*Id.* at 118. In short, the notion that home-ownership by low-income Vermonters is at least as worthy a public good as college fraternities and county field day celebrations is not jarring.

¶ 45. Moreover, the Legislature has enacted restrictions on development throughout the state that affect the value of property subject to those restrictions while promoting a perceived public good. A regulated property is appraised at its fair market value subject to whatever restrictions apply, rather than the amount a seller would pay on the open market for otherwise identical property not subject to such restrictions, 32 V.S.A. § 3481(1), so a town realizes less tax revenue from that property than it would have in the absence of the regulations, and other taxpayers in the town pay more than they otherwise would have. Diminution in the taxable value of property resulting from state regulation is by no means unique to the affordable housing setting.

¶ 46. My understanding of the statute is also consistent with the way it applies to subsidized *rental* housing. Prior to 2005, the statutory section that requires consideration of qualifying housing-subsidy covenants on residential property lumped together restrictions applicable to rental and nonrental properties, requiring

"consideration" of those restrictions in valuing either kind of property. 32 V.S.A. § 3481(1) (2004) (amended 2005). In an unpublished and nonprecedential 2002 entry order, a three-Justice panel of this Court reversed an appraisal based on an income-capitalization approach that assumed market rents were unobtainable in light of the applicable statutory restrictions. The panel concluded that the statutory requirement that the appraisal include a consideration of a decrease in value due to a housing-subsidy covenant precluded the appraiser from relying on actual market rents and required, instead, consideration of rents actually obtainable in light of the covenants. *Laterre House Ltd. P'ship v. Town of Wilmington*, No. 2001-341, 2002 WL 34423628, at *3 (Vt. Mar. 27, 2002) (unpub. mem.), https://www.vermontjudiciary.org/LC/unpublishedeo.aspx. The panel was right in 2002, and the logic of its decision applies with just as much force in the context of nonrental residential property. As with rental property, the valuation of nonrental residential property subject to housing-subsidy covenants must be determined with reference to the proceeds a prospective buyer could actually receive upon resale of the property in light of the covenants, not based on the fair market value of a hypothetical, otherwise identical piece of unrestricted property.[7]

¶ 47. The position of the Division of Property Valuation and Review (PVR) of the Department of Taxes reinforces my conclusion. The Legislature has assigned PVR responsibility for providing technical assistance and instruction to the listers in a uniform appraisal system, and assisting municipalities in the administration of property taxes, including the appraisal of classes of property difficult to appraise. 32 V.S.A. § 3411(5), (10). Pursuant to this authority, the director of PVR issued a memorandum to boards of

---

[7] The majority points to specific language in the statute added in 2005 that sets forth a methodology for valuing residential rental property subject to housing subsidy covenants. *Ante,* ¶ 12 n.2. The majority points to this language as evidence that the Legislature could have, but did not, adopt a specific required methodology for valuing nonrental residential property. *Id.* I do not disagree with that general conclusion. By providing a methodology for valuing rental residential property subject to housing-subsidy covenants that takes into account the rents realizable pursuant to those covenants — incorporating by reference the U.S. Department of Housing and Urban Development's market value figures — the language, as revised, also reinforces the understanding that the statute calls for valuation of property with reference to the value a prospective purchaser could actually realize from the property rather than the hypothetical value of otherwise identical unrestricted property.

listers in November 2008 providing guidance concerning valuation of owner-occupied homes subject to resale restrictions as defined in 27 V.S.A. § 610. While this appeal was pending, on January 3, 2012, the Commissioner of the Department of Taxes issued a technical bulletin signed by the director of PVR and the Commissioner that incorporates the analysis of the November 2008 memorandum. Far from contradicting the requirements of the statute, the memorandum and bulletin reinforce that the statute here requires town listers to determine the value of property subject to housing-subsidy covenants with reference to what a purchaser would actually pay for the property *with the restrictions*.

¶ 48. I am not taking issue with the majority's conclusion that the PVR memorandum does not compel the use of PVR's recommended methodology for valuing the property here to the exclusion of any other approach. *Ante*, ¶¶ 18-19. But the memorandum and the Commissioner's position have broader significance. The PVR memorandum offers a specific mechanism for valuing properties subject to housing-subsidy covenants, but the core message of the memorandum is more general: Listers should value properties subject to resale restrictions based on their restricted value and not their fair market value without regard to the restrictions. In the end, this Court is the arbiter of questions of law. However, PVR's interpretation of the requirements of the tax statute is entitled to the same deference we afford other agency interpretations of statutes within their purview. See *Mollica v. Div. of Prop. Valuation & Review*, 2008 VT 60, ¶¶ 9, 11, 184 Vt. 83, 955 A.2d 1171 (we generally defer to administrative agencies interpreting statutes within their legislatively delegated expertise, though our "paramount concern" is construing a statute consistent with its express purpose).

¶ 49. This understanding of the proper application of 32 V.S.A. § 3481 is consistent with our application of the statute in other contexts. In the case of *Townsend v. Town of Middlebury*, 134 Vt. 438, 365 A.2d 515 (1976), this Court considered the impact of a renewable lease and a preemptive purchase option on a property's fair market value for property tax purposes. Noting that § 3481 requires consideration of laws affecting the use of a property in determining the property's value, this Court concluded that "the Legislature intended that bona fide restraints affecting property, at least those governmental in origin, should be a factor in determining fair market value." *Id.* at 440, 365 A.2d at 516. The

Court extended the principle to include restraints in favor of a nongovernmental entity arising from private dealings — a renewable lease and a preemptive purchase option — on the ground that all of the elements affecting the availability of the property and its use combine to give property a market value. *Id.* The Court concluded that it was "obvious" that the lease/option affected the market value of the property because:

> [a] buyer, confronted with the presence of a lease/option involving a parcel of property which [the buyer] was interested in purchasing, would certainly take such agreement into account in determining what price [the buyer] would find acceptable for the parcel desired since any such agreement would affect both the use and future alienability of the property.

*Id.* Accordingly, we concluded that the property should be valued at the price a willing buyer would pay to purchase it *subject to the relevant restrictions. Id.*

¶ 50. For all of these reasons, I believe the statute requires that the touchstone for valuing property subject to a housing-subsidy covenant is the amount an individual buyer would pay to purchase the property subject to the various restrictions that apply, and is not the total unrestricted value the property would have in the absence of the covenant.

## II.

¶ 51. The majority does not expressly hold otherwise,[8] and does not squarely address what I believe to be the central legal issue in this case. Instead, it weighs the competing arguments on the question of fair market value as if they were evidence about a question of fact, without isolating and independently addressing the threshold legal question that should drive the factual analysis. Lurking silently within the "evidence" and findings the majority relies upon as supporting the state appraiser's conclusion in the *Franks* case, as well as in the failings the Court points to in the state appraiser's analysis in the *Rockingham* case, is an unspoken

---

[8] The majority's discussion distinguishing the New Jersey Superior Court Appellate Division's opinion in *Prowitz* and suggesting that taxpayers here seek to shift a disproportionate tax burden to fellow taxpayers suggests that the majority believes that the *unrestricted* value of the properties at issue in these cases determines fair market value, but the majority does not expressly say so. *Ante,* ¶¶ 11-12.

conclusion that the *unrestricted* market value is the guiding star in valuating the property at issue in these cases.

## A. Franks

¶ 52. In the *Franks* case, the majority recounts the testimony supporting the state appraiser's decision. The majority notes that the Essex town assessor found no evidence that the covenant reduced "the value of the property." *Ante,* ¶ 24. But the majority also rightly acknowledges that the same witness took the position that the covenant dictates the option price at which the owner must sell the property back to Champlain Housing Trust (CHT), and the amount of equity the owner may realize upon sale, but did not affect the "value" of the property. *Id.* The town assessor's conclusion that the covenant does not impact value rests entirely on his position that the total, hypothetical, unrestricted value of the property is what is legally relevant in the determination of "value," as opposed to the amount of equity a particular owner (and thus a prospective buyer) might realize on resale. Likewise, the same town assessor used "comparable sales" to establish that the covenants did not impact the value of the property. But the "comparable sales" data he used relied on the prices reflected on the PTTR — the figure reflecting the hypothetical, unrestricted value of the property to a willing buyer. Again, the weight of this "evidence" depends entirely on the validity of the legal assumption on which the town assessor based his conclusion.

¶ 53. The majority cites a real estate appraiser who similarly testified that the covenants do not decrease the value of the property. *Ante,* ¶ 25. As the majority says, this expert testified that the *restricted price* is not arrived at by way of an arms-length transaction because it is the result of a contractual arrangement between the owner and housing trust, and although the covenants affect the net amount sellers receive when they sell the property, the subsidy provided by the housing trust does not actually reduce the property's value. *Id.* Again, this expert clearly views the operative value as the unrestricted fair market value, not the value that an individual would pay to purchase the property subject to the resale restrictions and limitations on equity realized. The relevance of his testimony depends on the soundness of his legal assertion.

¶ 54. The majority describes the testimony of a different town assessor who likened the covenants in the *Franks* case to "back

end loaded mortgages," and testified that his town does not adjust the value of property based on the amount of outstanding liabilities, presumably including mortgages, on the property. This testimony similarly rests on a legal conclusion that the relevant value is the whole value of the unrestricted property — not simply the owner's "equity."[9]

¶ 55. Finally, the majority notes that taxpayer failed to present comparable-sales market evidence to show that the covenant reduced fair market value. If my understanding of the law is right, the concept of relying on comparable-sales data makes no sense — especially if the "sales price" of the comparable sales is the unrestricted value reflected on the PTTR. By definition, as noted by the majority, the property purchases in these cases are not arms-length, market transactions. The actual price an individual pays to buy a home — and the return the individual can potentially receive on resale — are largely a function of the CHT grant associated with the property. The larger the grant, the lower a buyer's cost to purchase the property and the lower a buyer's potential proceeds upon resale. It is difficult to imagine how one could construct a meaningful "comparables" analysis in this context. That is no doubt why the methodology suggested by PVR focuses on the buyer's actual net purchase price, or net purchase price plus twenty-five percent of the appreciation, as the marker of fair market value.

¶ 56. That the state appraiser equated fair market value with the property's hypothetical unrestricted value is clear from the numbers. Franks paid $81,250 to purchase her property in 2003. At the time, the unrestricted value of the property was $130,000. The unrestricted value of the property had risen to $173,900 in 2010 — representing an increase in the hypothetical, unrestricted value by $43,900. If Franks sought to sell the property, she would be required to sell to CHT for an option price, which, assuming she had not made any significant capital improvements, would be

---

[9] The analogy also fails to acknowledge the critical distinction between a mortgage encumbering property and the arrangement at issue here: The Vermont Legislature has not passed a statute requiring that an appraisal for property tax purposes take into account the indebtedness encumbering real property through a mortgage securing a debt, but *has* specifically required consideration of the housing subsidy covenants. 32 V.S.A. § 3481. Though the subsidy in the *Franks* case may function financially in a way that is analogous to a mortgage, the distinct arrangements are apples and oranges with respect to the laws governing property valuation.

$92,225 (($130,000 less $48,750 in grants) plus .25($43,900)). The state appraiser has concluded that a willing buyer would pay $173,900 for property that taxpayer could not sell for more than $92,225. He was obviously considering the unrestricted value of the property in ascertaining fair market value. That a buyer would not pay anything close to $173,900 to purchase property that could be resold for no more than $92,225 seems self-evident. See *Townsend*, 134 Vt. at 440, 365 A.2d at 517 (buyer considering parcel subject to lease/option "would certainly take such agreement into account" in determining an acceptable price for the parcel desired "since any such agreement would affect both the use and future alienability of the property.").

¶ 57. In sum, the state appraiser's conclusion in *Franks* does not represent a weighing of the evidence warranting the deference this Court affords to the state appraiser's findings of fact; rather, it reflects a legal determination about the definition of fair market value in the context of resale restrictions incident to affordable housing programs. Because I conclude that the legal standard applied by the state appraiser was wrong, I would reverse the state appraiser's decision and remand for a determination of what a willing buyer would pay to buy the property subject to the various resale restrictions, including the restriction on the equity a buyer could recover from the property upon resale.

## B. Rockingham Area Community Land Trust

¶ 58. In the *Rockingham* case, the majority is not so deferential to the state appraiser's determination of fair market value, rejecting the state appraiser's determination because the taxpayer had failed to produce evidence of comparable sales. *Ante*, ¶ 33. For the reasons noted above, the concept of "comparable sales" is not that helpful in the unique circumstance of property subject to restrictive housing-subsidy covenants.

¶ 59. The state appraiser in the *Rockingham* case thoroughly reviewed the testimony of the various parties and commonsensically concluded that the housing-subsidy covenant "removes one of the bundle[s] of rights an owner has or prospective buyer should consider before purchasing a property." Given the Legislature's express instruction that fair market value be ascertained with consideration of the impact of the housing-subsidy covenant restrictions, 32 V.S.A. § 3481, he reasonably concluded that the Town's assessed value did not comply with the statute. He

rejected the Town's legal analysis, explaining that "while the full value of the property may well continue to be represented by the buyer's investment plus the grant . . . the legislation evinces a clear intent to remove a portion of the value that would otherwise be taxable from the appraisal value in order to advance a separate legislative goal favoring affordability of housing." I find the state appraiser's legal analysis in the *Rockingham* case spot-on.

¶ 60. As in the *Franks* case, the numbers clearly make this point. If Margaret wanted to sell her property, assuming she made no capital improvements, she could not sell in the first instance for more than $108,350, calculated as follows:

$121,200  (unrestricted value when she bought it)

- $18,500  (grant from the land trust and appreciation during the prior owner's tenure)

+$5,650  (twenty-five percent of appreciation of unrestricted value based on Board of Civil Authority's valuation)

Given these figures, no reasonable buyer would pay $143,800 to step into her shoes. The state appraiser's conclusion that the actual fair market value of the property was accordingly substantially lower than the unrestricted value asserted by the Town of Rockingham jibes with the evidence.

¶ 61. I agree with the majority that the state appraiser's rationale for designating $118,000 as the value of the property is not entirely clear. That the state appraiser's 2010 appraisal is identical to the 2009 appraised value is clear. The reason the state appraiser adopted the 2009 appraisal values for the property is not clear. I would remand to the state appraiser to explain the basis for adopting the 2009 appraised value for 2010, or for further proceedings.

### III.

¶ 62. This is a straightforward case of statutory interpretation. The majority has taken its best shot at discerning the proper application of Vermont's statutory scheme regarding taxation of property subject to restrictive housing-subsidy covenants. For the reasons noted above, I disagree with its conclusions. The good news is that the ultimate power to determine how properties like the ones in this case are appraised remains with the Legislature.

If the majority got it right, the Legislature can be satisfied with this decision. If the majority's understanding of the statutory scheme does not jibe with the Legislature's intent, the Legislature can amend the statute to make its intentions more clear.