STATE OF VERMONT

| | |
|---|---|
| SUPERIOR COURT | ENVIRONMENTAL DIVISION |
| Vermont Unit | Docket No. 103-8-13 Vtec |

| | |
|---|---|
| B&M Realty A250 Applic. | DECISION ON THE MERITS |

B&M Realty, LLP (Applicant) seeks to develop an area consisting of 167.7 acres on three separately deeded lots located between Woodstock Road (U.S. Route 4) and Old Quechee Road near the I-89 southbound exit ramps in the Town of Hartford, Vermont (Town).[1] In 2005, Applicant and then-landowners David and Ernest Punt requested an amendment to the Hartford Zoning Regulations on and around lot 8-196 (the Punt property) to accommodate future development of the area. The Town of Hartford Planning Commission (the Planning Commission) voted to approve the zoning amendment on September 26, 2005, and the Town Selectboard held a public hearing on the matter in November of that year.

Six years later, on May 18, 2012, Applicant filed an application with the Planning Commission for a zoning permit, as required by the applicable provisions of the Town of Hartford Zoning Regulations, to develop the three lots into a mixed commercial and residential use development to be known as the Quechee Highlands project (the Project). The Planning commission granted the application in a written decision dated October 17, 2012. Applicant subsequently filed an application for an Act 250 permit as required by 10 V.S.A. § 6081. District Environmental Commission #3 (the District Commission) denied the application in a written decision dated July 3, 2013, and Applicant filed a timely appeal in this Court.

Applicant raises fourteen questions for our review, all addressing the Project's compliance with three of the ten Criteria for Act 250 permit review in 10 V.S.A. § 6086. The first

---

[1] Two lots are located on Woodstock Road (U.S. Route 4) and one, lot 8-196, is located on Old Quechee Road.

two questions address the project's compliance with Criteria 5 and 9(k). The remaining twelve questions address the Project's compliance with the Two Rivers-Ottauquechee Regional Plan (Criterion 10).

In our October 7, 2014 decision, in response to Applicant's motion for partial summary judgment, we concluded that the 2007 version of the Two Rivers-Ottauquechee Regional Plan would be relevant to our Act 250 Criterion 10 analysis. In reaching this conclusion, we answered Applicant's Questions 6 and 10. Prior to our merits hearing Applicant withdrew Applicant's Question 11.

The Court held a merits hearing on March 17, 2015. The Planning Commission and the Vermont Natural Resources Board (NRB) participated as Appellees. Interested parties David, Carol, and Charles Rataj (the Ratajs) also participated. Applicant is represented by Paul Gillies, Esq., the Planning Commission is represented by Robert E. Woolmington, Esq., and Melanie Kehne, Esq. represents the Natural Resources Board. The Ratajs are self-represented in this matter.

Before turning to our findings of fact and decision on the merits, we address the Ratajs' post-hearing motion to re-open the evidence.

**Motion for New Trial**

On April 14, 2015, the Ratajs filed a motion to reopen the evidence from the March 17, 2015 merits hearing and asked the Court to accept two additional exhibits and allow them to call a rebuttal witness. The Ratajs claim their proposed exhibits contradict the accuracy of evidence and testimony offered by Applicant's traffic expert, Mr. Saladino, concerning vehicle accident numbers and road safety. Further, the Ratajs argue that late disclosure of Mr. Saladino's revised memorandum warrants an opportunity to recall Mr. Saladino and offer a rebuttal witness.

At the March 17, 2015 hearing, through Mr. Saladino, Applicant offered traffic accident data from the Vermont Agency of Transportation (VTrans) reporting that between 2006 and 2010, there were ninety-eight accidents along U.S. Route 4, with an additional thirty-three accidents along U.S. Route 5. Mr. Saladino testified that a crash must result in over one thousand dollars of property damage or in serious injury or death for the accident to be reported by VTrans. Additionally, Mr. Saladino testified that, based on his 2012 report,

2

Applicant's proposal to add several traffic turning lanes and a traffic control light, as well as its recommendation to reduce the posted speed limit, would adequately address road safety concerns associated with the proposed development. Applicant also offered Mr. Saladino's revised report, Exhibit 1006, which incorporated traffic data made available since Mr. Saladino's previous 2012 report. The revised report concludes that the existing conditions on the northbound I-89 exit along U.S. Route 4 should be downgraded from a service level of E to F.

At the hearing, the Regional Planning Commission and the Ratajs objected to the admission of Exhibit 1006 because the revised report had not been disclosed until ten days before trial. Applicant admitted that the updated report had only been produced ten days before trial but offered that, although the updated report included more recent traffic numbers, the only revision to Mr. Saladino's substantive conclusions was to downgrade the level of service he had previously determined for the northbound exit. Applicant further argued that, since its proposed mitigation would raise the service level to B—far better than the existing congestion level—the conclusion that congestion had worsened since the 2012 report, was not material. In order to have the most recent information before it, the Court admitted the exhibit, but explained that it would leave the record open for three weeks until April 7, 2015 for the parties to file any responses or to possibly recall Mr. Saladino concerning Exhibit 1006.

In their April 15, 2015 motion, the Ratajs ask the Court to consider two exhibits as rebuttal to Mr. Saladino's testimony and revised report. The Ratajs also request that they be permitted to recall Mr. Saladino and to offer their own rebuttal witness in order to challenge the information provided in the untimely disclosure of Exhibit 1006. The Ratajs' Exhibit A, a printout from the Hartford Police Department, shows the number of accidents recorded by the Hartford Police along U.S. Route 4 to be about double the figure recorded by VTrans for the same period. The Ratajs' Exhibit B is meeting notes from the Vermont Highway Safety Alliance discussing the tendency of drivers to drive 4-7 miles per hour above the posted limit along U.S. Route 4 in the area of the proposed development.

In its response filed on April 30, 2015, Applicant opposes the Ratajs' request to reopen the evidence. Applicant argues that the Ratajs were afforded a full opportunity to participate at the hearing and should not now be permitted to file documents and present arguments that

3

should have and could have been presented at the hearing. Further, Applicant contends that the Ratajs' request to reopen the evidence is untimely as the deadline for all post-trial filings has passed. Moreover, Applicant argues the evidence submitted is irrelevant because the mitigation steps Applicant proposes would raise the level of service from either an E or an F to a B, and thus there is no need to challenge Mr. Saladino's conclusion in his revised report.

A motion to reopen the evidence will be treated as a motion for a new trial under V.R.C.P. 59(a). See In re Petition of Twenty-Four Vt. Utilities, 159 Vt. 339, 356–57 (1992). Rule 59(a) provides that, after a bench trial, "on a motion for a new trial . . . , the court before which the action has been tried may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment." V.R.C.P. 59(a); see also V.R.E.C.P. 5(a)(2) (providing that the Vermont Rules of Civil Procedure apply to appeals from decisions of a district commission in Act 250 proceedings "so far as applicable"). It is within the trial court's discretion whether to admit further evidence after the close of testimony. In re Bjerke Zoning Permit Denial, 2014 VT 13, ¶ 16, 195 Vt. 586. Among several factors, the court may consider the necessity of the offered evidence to reach a just determination, the reason the evidence was not offered earlier, and the prejudice to the non-moving party. See V.R.C.P. 59(a); V.R.E.C.P. 4(a)(2); see also Town of Georgia v. King, No. 105-6-10 Vtec, slip. op. at 2 (Vt. Super. Ct. Envtl. Div. Oct. 19, 2011) (Durkin, J.).

Turning first to the Ratajs' exhibits, the Court is concerned that the Ratajs should have and could have presented this information at trial. Exhibits A and B appear to challenge Applicant's offer of VTrans accident data and Applicant's contention that adding turning lanes and an actuated traffic light and reducing the speed limit along U.S. Route 4 will adequately address the safety concerns from additional traffic caused by the Project. Applicant's position concerning this information was known and available well before March 17, 2015. While the Court recognizes the difficulty self-represented litigants like the Ratajs face at trial and acknowledges their wish to contest the evidence presented by Applicant, their choice to proceed without an attorney does not absolve them of their obligation to make timely discovery requests and to be prepared to present their full case at trial. See V.R.C.P. 26. The Ratajs were afforded a full and fair opportunity to challenge any and all evidence at the hearing and to present their own rebuttal evidence. Nevertheless, because the Court strives to consider

4

all relevant evidence in reaching its decision and because we see no prejudice to Applicant in our consideration of the late offered evidence, the Court will admit the Ratajs' Exhibits A and B.

The Court, however, rejects the Ratajs' request to recall Mr. Saladino and to present a rebuttal witness. The Ratajs have failed to make any proffer of the need to recall Mr. Saladino and have given no indication of what their unidentified rebuttal witness will offer. See S. Burlington School District v. Calcagni-Frazier-Zajchowski Architects, Inc., 138 Vt. 33, 52 (1980) ("Where, as here, the reasons stated [for recalling a witness] are general and no offer is made as to what will be adduced, it is within the trial court's discretion to refuse to allow the recall."). The Court's decision to admit the Rataj's exhibits does not give the Ratajs license to re-examine Applicant's expert about any matter. As was discussed at the trial, the only substantive change in Mr. Saladino's revised report was his conclusion that, based on the most recent traffic data, the level of service for the I-89 Northbound exit off U.S. Route 4 should be downgraded from an E to an F. Mr. Saladino's proposed mitigation remained consistent, as did his conclusions on the traffic safety impact of the project. Therefore, the Court finds the Ratajs' blanket assertion that they should be permitted to recall Mr. Saladino and offer a rebuttal witness, without any proffer as to need or scope, does not warrant prolonging this matter further.

The Court **GRANTS** in part and **DENIES** in part the Ratajs' motion to reopen the evidence. The Court admits the Ratajs' Exhibits A and B, but denies the Ratajs' request to recall Mr. Saladino and to offer a rebuttal witness.

We now turn to our decision on the merits, and based upon the evidence presented at trial as well as the recent addition of the Ratajs' Exhibits A and B, the Court renders the following Findings of Fact and Conclusions of Law.

## Findings of Fact

1. Applicant B&M Realty, LLC owns 167.7 acres consisting of three parcels on U.S. Route 4 in Hartford, Vermont (the Property).
2. The Property is mostly undeveloped; however, it does presently contain a single-family dwelling and garage and a 2,433 square foot commercial building.
3. The Property has frontage on U.S. Route 4 and Old Quechee Road.
4. The Property is located in Hartford's Quechee Interstate Interchange (QII) and Rural Lands Five (RL-5) Zoning Districts.

5. The Property is approximately two miles from the Quechee Gorge, two miles from Quechee Village, and five miles from White River Junction.

6. The area south of the Property on U.S. Route 4 includes a former Century 21 real estate office, a country store with an upstairs apartment, a construction equipment sales business, and miscellaneous scattered businesses.

7. A convenience store/gas station is located south of the Property and adjacent to U.S. Route 4 opposite the I-89 southbound ramp and U.S. Route 4 intersection.

8. The area north of the Property on U.S. Route 4 does not have much development.

9. Both the north and southbound exits from I-89 are in the Project area and are located about one-half mile apart.

10. Applicant proposes a phased-development project on the Property, designed as a mixed-use business park including office, retail, restaurant and residential uses. There will be no "big box" stores.

11. Phase 1 of the Project entails approximately 15.5 acres for a clustered mixed-use development located in the QII Zoning District. Phase 1 includes more than 115,000 square feet of new construction to be completed in three construction cycles.

12. Phase 1A consists of 18,142 square feet of office space, 18,142 square feet of retail space, and a 5,667-square-foot restaurant.

13. Phase 1B consists of 15,110 square feet of office space, 15,110 square feet of retail space, and nine residential units.

14. Phase 1C consists of 33,000 square feet of office space.

15. Phase 2 is proposed as fifty residential units.

16. Approximately 2,700 linear feet of internal roadway designed more or less as a loop will be constructed for Phase 1 buildout.

17. The Project has a "center," which mimics a small version of the Church Street Marketplace in Burlington, Vermont.

18. Access to the Property will be via a single curb cut on U.S. Route 4 approximately 525 feet north of the I-89 southbound ramps. This access will have an island separating entering and exiting traffic.

19. Applicant retained RSG, Inc. to conduct a traffic impact study for the Project area. GSG, Inc. issued its report in May 2012; compiled a traffic overview for the District 3

Environmental Commission in January 2013; and updated its traffic analysis with a March 4, 2015 memo.

20. RSG, Inc. evaluated U.S. Route 4 and its intersections, including I-89 northbound and southbound ramps, in the area of the Project.

21. No background traffic growth is projected for the Project area.

22. U.S. Route 4 is an east-west arterial across the middle of Vermont. U.S. Route 4 is mostly a two-lane road that parallels the Ottauquechee River valley.

23. U.S. Route 4 is part of the national highway system and is part of Vermont's tractor truck network. Thus, mobility and safety issues relating to U.S. Route 4 are significant.

24. U.S. Route 4 in the area of the Property's curb cut has a speed limit of 45 miles per hour.

25. The required stop distance for traffic on U.S. Route 4 in the Project area is 360 feet. The corner sight distance for vehicles exiting the Project access is 500 feet. The Project exceeds these standards.

26. Roadside vegetation will be cut back along the inside curve of U.S. Route 4 east of the Project access road and between I-89 northbound and southbound ramps. This work will improve sight distances.

27. Costello Road intersects with U.S. Route 4 between I-89 northbound and southbound ramps. Costello Road leads to Old Quechee Road.

28. The Rataj residence is located on Old Quechee Road. The Ratajs use Old Quechee Road and Costello Road to access U.S. Route 4.

29. Traffic congestion is related to delay experienced by vehicles traveling on roadways and through intersections.

30. The Vermont Department of Transportation (VTrans) uses Levels of Service (LOS) to measure vehicle delay for signalized and un-signalized intersections. Vtrans's Highway Capacity manual defines LOS as the quantitative stratification of a performance measure or measures that represents quality of service. LOS is not a measure of safety.

31. VTrans classifies LOS's as follows:

| LOS | Characteristics | Unsignalized Total Delay (Sec) | Signalized Total Delay (Sec) |
|---|---|---|---|
| A | Little or no delay | ≤ 10.0 | ≤ 10.0 |

| | | | |
|---|---|---|---|
| B | Short delay | 10.0 – 15.0 | 10.1 – 20.0 |
| C | Average delay | 15.1 – 25.0 | 20.1 – 35.0 |
| D | Long delay | 25.1 – 35.0 | 35.1 – 55.0 |
| E | Very long delay | 35.1 – 50.0 | 55.1 – 80.0 |
| F | Extreme delays | > 50.0 | > 80.0 |

32. The LOS or the amount of delay that is considered reasonable varies depending on the location or context of the travel area. A rural area will accept less delay than an urban area.

33. Roadways are not typically designed to provide LOS A; rather, a balance is struck between cost, environmental impact, and travelers' and society's desires.

34. The a.m. (7:30 to 8:30) and p.m. (4:30 to 5:30) peak hour for traffic are the 60 minutes in the morning and evening with the most commuting traffic at an intersection. The traffic design hour is the thirtieth highest traffic volume for a given hour at a specific location in a year.

35. VTrans's policy is to design roadways and highways to maintain an LOS C for the prescribed design period, although for two-way-stop-controlled intersection approaches, an LOS D is an acceptable level of service.

36. Generally, longer delays increase driver frustration, and result in a corresponding increase in accidents.

37. Except for the U.S. Route 4/I-89 northbound off-ramp during the p.m. peak hour, all intersections have LOS's that exceed LOS C with or without Project buildout. The U.S. Route 4/I-89 northbound off-ramp during p.m. peak hours has a projected LOS F if the project is not built. Without any mitigating measures, the intersection would have an LOS F if the Project were built. Thus, if the Project is built, intersections either maintain present delay levels or experience relatively minor increases in vehicle delays.

38. Installing an actuated traffic signal at the U.S. Route 4/I-89 northbound ramp intersection would bring the LOS at the intersection to a B for both a.m. and p.m. peak hours.

39. There are four high-crash locations (HCL) in the Project area. Both the I-89 northbound and southbound ramp intersections are HCLs. The two other HCLs are on U.S. Route 4 west of the I-89 ramps.

40. The neighboring convenience store/gas station has two curb cuts off U.S. Route 4, the nearest being approximately 450 feet south of the Project access road. This area is a high crash site.

41. Tractor trailer trucks park from time to time between the convenience store/gas station curb cuts and obstruct sight distances for vehicles exiting and entering the station.

42. VTrans recommends the following traffic mitigation measures for the Project:

    a. The Applicant shall request a formal speed study to examine lowering the posted speed limit on U.S. Route 4 from the I-89 southbound ramp to the I-89 northbound ramp from 45 mph to 40 mph after completion of each phase of development.

    b. Prior to completion of Phase 1A, Applicant shall construct a westbound left turn lane at the U.S. Route 4/I-89 southbound ramp intersection for traffic entering I-89 Southbound.

    c. Prior to completion of Phase 1B, Applicant shall construct a westbound right turn lane on U.S. Route 4 into the Project site.

    d. Prior to completion of Phase 2, Applicant shall construct an eastbound left turn land on U.S. Route 4 into the Project site.

    e. Applicant shall pay its proportional share of mitigation measures for existing adverse traffic and safety condition on U.S. Route 4 including the installation of a signal at the U.S. Route 4/I-89 northbound ramp.

43. Construction of the westbound left turn lane at the U.S. Route 4/I-89 southbound ramp intersection for traffic entering I-89 southbound would narrow the shoulder of the roadway in the area of the convenience store/gas station thereby reducing the ability of tractor trailers to park on the roadside between the convenience store/gas station curb cuts.

44. Construction of the additional turning lanes recommended by VTrans is projected to reduce the rate of traffic accidents by 20 to 25 percent.

45. Installation of a signal at the U.S. Route 4/I-89 northbound ramp is projected to reduce the rate of traffic accidents by approximately 50 percent.

46. The Town of Hartford has a duly adopted municipal plan (Municipal Plan).

47. In 2003, the Two Rivers-Ottauquechee Regional Commission adopted the 2003 Two Rivers-Ottauquechee Regional Plan (the 2003 Regional Plan). Because the Town was not a member of the Two Rivers-Ottauquechee Regional Commission in 2003, the 2003 Regional Plan does not recognize or address the Town of Hartford.

48. On January 9, 2004, the Town discontinued its relationship with the Upper Valley Lake Sunapee Regional Planning Commission and joined the Two-Rivers Ottauquechee Regional Commission (the Regional Commission). As part of the new association, the Town adopted the 2003 Regional Plan.

49. On July 11, 2005, Scott Milne, acting on behalf of B&M Realty, and David and Ernest Punt, owners of the Punt property at the time, filed an application with the Planning Commission requesting an amendment to the Hartford Zoning Regulations to expand the commercially developable acreage of the Punt property by 300 percent. The application requested the conversion of 10± acres on the northwest side of the Punt property from RL-5 to RL-3 and 35± acres on the east side of the lot from RL-3, RL-5, and RC-2 to a new zoning district, the Quechee Interstate Interchange (QII).

50. On September 26, 2005, the Hartford Planning Commission approved the proposed amendments to the Hartford Zoning regulations affecting the Punt property.

51. Applicant subsequently purchased the Punt property.

52. In 2006, acting on behalf of Applicant, Scott Milne presented the Planning Commission and professional staff with a site plan for the Project.

53. In 2007, the Regional Commission adopted the 2007 Two Rivers-Ottauquechee Regional Plan (the 2007 Regional Plan), which replaced the 2003 Regional Plan.

54. On May 18, 2012, Applicant filed an application with the Planning Commission for the zoning permits necessary to develop the Project.

55. The Planning Commission granted preliminary approval of the Project on June 25, 2012 and final approval of the Project on October 17, 2012.

56. On December 20, 2012, Applicant filed an Act 250 permit application, which the District Commission denied in a written decision dated July 3, 2013. Applicant timely appealed the denial of its application to this Court.

## Discussion

Applicant has raised fourteen questions in this appeal, all related to three of the ten Criteria for permit approval under Act 250. See 10 V.S.A. § 6086. The first two questions address the Project's compliance with Criteria 5 (traffic) and 9(K) (public investment). The remaining twelve questions address the Project's compliance with the Regional Plan under Criterion 10.

**I.**     **Criterion 5 – Traffic:**

*Whether the Project will cause unreasonable congestion or unsafe conditions with respect to transportation?*

Act 250 Criterion 5 requires that a development "[w]ill not cause unreasonable congestion or unsafe conditions with respect to use of the highways, waterways, railways, airports and airways, and other means of transportation existing or proposed." 10 V.S.A. § 6086(a)(5). We cannot deny a permit "for a project that creates unsafe conditions within the meaning of [C]riterion 5, but permit conditions can be imposed to remedy those conditions." In re Agency of Transp., 157 Vt. 203, 207 (1991) (citing 10 V.S.A. § 6087(b)). While an opponent to a proposed development carries the burden of persuasion under Criterion 5 to show that the proposed development will cause "an unreasonable or adverse effect," 10 V.S.A. § 6088(b), the applicant must produce sufficient evidence for the Court to make positive findings. See In re Route 103 Quarry, No. 205-10-05 Vtec, slip op. at 8 (Vt. Envtl. Ct. Nov. 22, 2006) (Durkin, J.) (stating that section 6088(b) pertains only to the burden of persuasion and that the "applicant always carries the initial burden of production").

In reviewing a project under Criterion 5, we consider its impact on the use of highways, including whether the project may exacerbate already congested or unsafe traffic conditions. In re Pilgrim Partnership, 153 Vt. 594, 596–97 (1990). When a project creates unreasonable congestion or unsafe conditions or exacerbates preexisting unreasonable congestion or unsafe conditions, we may impose conditions to alleviate the congestion and unsafe conditions. Id.

11

"[An] LOS below C is generally inconsistent with Criterion 5." Re: Okemo Ltd. Liability Co., et al., No. 2S0351-34-EB, Findings of Fact, Conclusions of Law, and Order, at 10 (Vt. Envtl. Bd. Sept. 8, 2005).[2] For two-way-stop-controlled intersections, however, VTrans's LOS Policy is to maintain an LOS D, or better. Moreover, VTrans's policy is to design roadways and highways to maintain an LOS C for the prescribed design period, although lower levels of service may be permitted on a case-by-case basis.

At the time of our merits hearing, the parties had mostly resolved traffic issues through proposed traffic mitigation measures. The Ratajs, however, remain concerned with traffic generated by the Project. The Ratajs reside off of Old Quechee Road and use Costello Road to access U.S. Route 4. The Ratajs raise traffic safety and congestion issues on U.S. Route 4 in the area of their residence. The Ratajs offer evidence of higher numbers of crashes and higher driving speeds than the VTrans numbers offered by Applicant. The Ratajs also challenge whether adding turning lanes will improve safety and congestion issues.

With the exception of one intersection, all intersections involved in the project will maintain acceptable traffic conditions if the project is built. The one exception is the U.S. Route 4/I-89 northbound off-ramp which has an unacceptable LOS of F.

An LOS F in either the build or no-build scenarios is an unreasonable level of congestion. To be clear, Applicant and this Project have not created the existing unreasonable congestion or unsafe conditions at the U.S. Route 4/I-89 northbound off-ramp. If the Project is approved and constructed, however, the traffic conditions for the U.S. Route 4/I-89 northbound off-ramp will degrade further. Installing an actuated traffic signal at the U.S. Route 4/I-89 northbound ramp intersection is projected to accommodate the Project build scenario traffic volumes with LOS B for both a.m. and p.m. peak hours.

There are four high-crash locations (HCLs) in the Project area. Both the I-89 northbound and southbound ramp intersections are HCLs. The two other HCLs are on U.S. Route 4 west of the I-89 ramps. Adding turn lanes, removing roadside vegetation and eliminating tractor trailer roadside parking, and reviewing and potentially reducing speed limits will mitigate these safety concerns.

---

[2] Prior decisions of the Environmental Board serve as precedent in this Court. 10 V.S.A. § 8504(m).

Based upon the credible, and largely unrefuted, evidence before the Court, we impose the following conditions to mitigate traffic concerns. The conditions were recommended by VTrans and offered by Applicant:

a. The Applicant shall request a formal speed study to examine lowering the posted speed limit on U.S. Route 4 from the I-89 southbound ramp to the I-89 northbound ramp from 45 mph to 40 mph after completion of each phase of development.
b. Prior to completion of Phase 1A, Applicant shall construct a westbound left turn lane at the U.S. Route 4/I-89 southbound ramp intersection for traffic entering I-89 southbound. This work shall include reducing the width of the shoulder along U.S. Route 4 in the area of the convenience store/gas station to eliminate tractor trailer parking in this area. Roadside vegetation shall be cut back along the inside curve of U.S. Route 4 east of the Project access road and between I-89 northbound and southbound ramps.
c. Prior to completion of Phase 1A, an actuated traffic signal shall be installed at the U.S. Route 4/I-89 northbound ramp. Applicant shall pay its proportional share of mitigation measures for this existing adverse traffic and safety condition.
d. Prior to completion of Phase 1B, Applicant shall construct a westbound right turn lane on U.S. Route 4 into the Project site.
e. Prior to completion of Phase 1C, Applicant shall construct an eastbound left turn lane on U.S. Route 4 into the Project site. [3]

Recent Vermont legislation empowers an Act 250 District Commission or the Agency of Transportation (and therefore this Court when considering an appeal) to assess a transportation impact fee to fund capital improvements necessary to mitigate transportation impacts of proposed developments. 10 V.S.A. §§ 6101–6111. The statute contemplates implementation through rules to be adopted by the Natural Resources Board or the Agency of Transportation. See 10 V.S.A. § 6111. We are not aware of the rules having been adopted. At trial, the parties did not specifically address this legislation; however, they do cite to it in their post-trial briefs.

---

[3] The application before the Court seeks approval of only Phase 1 of the proposed development. We note that Applicant's traffic study evaluated impacts associated with all Project development phases and concluded that an eastbound left turn land on U.S. Route 4 into the Project site was not warranted until completion of Phase 2. VTrans appears to adopt these conclusions. Applicant's May 2012 traffic study, however, conservatively indicated that the construction of an eastbound left turn land on U.S. Route 4 into the Project site is first warranted with Phase 1C buildout. See Exhibit 20, pages 35 - 36. The Court requires the more conservative approach.

13

Our implementation of Act 250 is a continual balance between competing interests. See In re Village Associates, 2010 VT 42A, ¶ 17, 188 Vt. 113 (noting that the "goals of Act 250 have always been balanced against the economic necessity of development . . . [resulting in] a practical approach to regulation."). In this matter, we must balance a development proposal and its associated additional traffic with an already existing traffic problem. The Court concludes that traffic mitigation measure are required. We leave it to the parties, however, to work through the financing details for the required actuated traffic signal to be installed at the U.S. Route 4/I-89 northbound ramp. To be clear, we conclude that Applicant shall pay its proportional share of this mitigation measure for the adverse traffic and safety condition at the U.S. Route 4/I-89 northbound ramp. As Applicant suggests, one potential option is for the developer to pay for the signal and then be reimbursed by future development that adds traffic to the U.S. Route 4/I-89 northbound ramp.

II.     **Criterion 9(K) – Public Facilities**

*Whether the Project will unnecessarily or unreasonably endanger the public or quasi-public investment in or materially jeopardize or interfere with the function, efficiency, or safety of, or the public's use or enjoyment of or access to adjacent public facilities?*

Criterion 9(K) directs the grant of a permit for a development on or adjacent to public lands if the Applicant demonstrates that the development "will not unnecessarily or unreasonably endanger the public or quasi-public investment" in those lands or "materially jeopardize or interfere with the function, efficiency, or safety of, or the public's use or enjoyment of or access to" those lands. 10 V.S.A. § 6086(a)(9)(K). This Criterion "seeks to protect state and local governments from adverse fiscal impacts on public facilities and investments that are adjacent to the proposed project." Re: St. Albans Grp. & Wal-Mart Stores, Inc., No. 6F0471-EB, Mem. of Decision, at 9 (Vt. Envtl. Bd. Apr. 15, 1994).

Our analysis under Criterion 9(K) is succinct, as we have already conducted a similar review under Criterion 5. The former Environmental Board held that when considering the impact upon a state or local highway, as a public investment, review can be similar under Criteria 5 and 9(K). Re: Pittsford Enters., No. 1R0877-EB, Findings of Fact, Conclusions of Law and Order, at 36 (Vt. Envtl. Bd. Dec. 31, 2002). The Board in Pittsford Enterprises did recognize, however, that there are important differences between the analysis under Criteria 5 and 9(K);

14

specifically the standard under Criterion 9(K) is higher than under Criterion 5, as Criterion 9(K) requires "material jeopardy or material interference." Id.

Except for the U.S. Route 4/I-89 northbound off-ramp during the p.m. peak hour, all intersections have acceptable LOS with or without Project buildout. The U.S. Route 4/I-89 northbound off-ramp during p.m. peak hours projects LOS F in both the no-build and build scenarios. If the Project is built, all intersections either maintain present delay levels or experience relatively minor increases in vehicle delays. Installing an actuated traffic signal at the U.S. Route 4/I-89 northbound ramp intersection is projected to accommodate the Project build scenario traffic volumes with LOS B for both a.m. and p.m. peak hours. As stated above, there are four high-crash locations (HCLs) in the Project area. Both the I-89 northbound and southbound ramp intersections are HCLs. The two other HCLs are on U.S. Route 4 west of the I-89 ramps. Adding turn lanes, removing roadside vegetation and eliminating tractor trailer roadside parking, and reviewing and potentially reducing speed limits will mitigate these safety concerns.

As conditioned above in our Criterion 5 analysis, we conclude that the Project will not unnecessarily or unreasonably endanger the public or quasi-public investment in or materially jeopardize or interfere with the function, efficiency, or safety of, or the public's use or enjoyment of or access to adjacent public facilities.

III.     **Criterion 10 – Regional Plan**

*Whether the Project conforms with any duly adopted local or regional plan?*

The remainder of Applicant's questions address the requirement of Act 250 Criterion 10 that the project proponent show that its proposal is in conformance with any duly adopted local or regional plan or capital program under 24 V.S.A. Chapter 117.  10 V.S.A. § 6086(a)(10). The burden of proof under Criterion 10 is on the applicant to show conformance.  10 V.S.A. § 6088.

In order for a plan's provisions to be binding on a project, the provisions must be mandatory in nature and not merely aspirational.  In re Rivers Dev., LLC, Nos. 7-1-05 Vtec and 68-3-07 Vtec, slip op. at 9 (Vt. Envtl. Ct. Jan. 8, 2008) (Durkin, J.).  If the plan language is intended only to establish broad goals and not mandatory standards, the inquiry ends and a

project cannot be denied under Criterion 10, based upon that language alone. Id. In other words, a finding of nonconformity must be "based on a 'specific policy' set forth in the plan . . . and stated in language that 'is clear and unqualified, and creates no ambiguity.'" In re John A. Russell Corp., 2003 VT 93, ¶ 16, 176 Vt. 520 (quoting In re Green Peak Estates, 154 Vt. 363, 369 (1990); In re MLB Assocs., 166 Vt. 606, 607 (1997) (internal citations omitted)).

Applicant's Question 3 asks, in general terms, whether the Project complies with the 2007 Regional Plan.[4] This question necessarily entails two sub-issues: (1) should the applicable plan be given effect in this case (Questions 4, 5, 7, 8, and 9); and (2) if so, does the Project satisfy all mandatory provisions of the applicable plan (Questions 12, 13, and 14).

a.      Does the Regional Plan Apply? (Applicant's questions 4, 5, 7, 8, 9)

The Regional Commission argues that Applicant's Project does not comply with certain provisions of the 2007 Regional Plan. Applicant argues that these provisions cannot be the basis of a finding of non-conformity because these provisions do not apply to its Project under 24 V.S.A. § 4348(h) because the Municipal and Regional Plans do not conflict and the Project will not have a substantial regional impact.

24 V.S.A. § 4348(h) delineates two situations where provisions of the regional plan shall apply: first, the provisions of a regional plan shall be given effect to the extent they do not conflict with the provisions of a duly adopted municipal plan, § 4348(h)(1); second, if a conflict does exists, then the regional plan shall apply if it is demonstrated that the project will have a substantial regional impact. § 4348(h)(2). In other words, if the provisions of a regional plan do not conflict with the municipal plan, only those mandatory provisions of a regional plan will apply to the proposed project. If the regional plan does conflict with the municipal plan, however, mandatory provisions of the regional plan will only apply to the project if it is first determined that the project will have a substantial regional impact. Therefore, in the case of no conflict, or where there is a conflict and a substantial regional impact exist, we must determine

---

[4] Prior to trial, we determined that the 2007 Regional Plan should be applied in reviewing the Project under Criterion 10, thus answering Applicant's Questions 6 and 10. In re B&M Realty Act 250 Applic., No. 103-8-13 Vtec, slip op. at 7 (Vt. Super. Ct. Envtl. Div. Oct. 7, 2014) (Walsh, J.).

whether there are mandatory, not merely aspirational, provisions of the regional plan that prohibit the project.

Here, neither Applicant nor Appellees have provided enough evidence for the Court to determine whether the provisions of the Regional Plan are in conflict with the Municipal Plan. Because we find it is Applicant's burden to show that the provisions of the plan do not conflict, we proceed as if provisions of the Regional Plan are in conflict with the Municipal Plan. We therefore turn to the question of whether the Project will have a substantial regional impact.

Applicant argues that the Regional Commission's definition of "substantial regional impact" is not justified as a matter of law, and thus the 2007 Regional Plan is unenforceable and should not govern (Question 5). Applicant gives three reasons for this assertion. First, Applicant argues that 24 V.S.A. § 4345a delegates unguided discretion to the Regional Commission in violation of constitutional nondelegation principles. Second, Applicant argues that the definition of "substantial regional impact" in the Regional Plan is arbitrary and standardless, and therefore violates due process. Third, Applicant argues that the Regional Plan improperly attempts to amend Act 250 Criterion 5. We address these arguments in turn, and, for the following reasons, find that Applicant's arguments are unpersuasive.[5]

Turning to Applicant's first point, Applicant argues that, because 24 V.S.A. § 4345a (defining the duties of the regional planning commissions) directs the Regional Commission to define "substantial regional impact" without providing any specific standards, the statute improperly gives unconstrained discretion to the Regional Commission. See 24 V.S.A. § 4345(a)(17) ("As part of its regional plan, [a regional planning commission shall] define a substantial regional impact, as the term may be used with respect to its region."). It is well established that the delegation of legislative authority to zoning bodies cannot be

---

[5] Related to Applicant's argument that the Regional Plan should not apply, Applicant's Question 8 asks, "Should the regional plan be given effect if the applicable planning commission has not met its obligations to review and consult with the host municipality regarding the municipality's planning efforts pursuant to 24 V.S.A. § 4350?" Applicant has provided no evidence that the regional planning commission failed to consult with the host municipality as directed by 24 V.S.A. § 4350. Furthermore, there is nothing in 24 V.S.A. § 4350 that suggests a regional plan is unenforceable if the regional planning commission does not adhere to the meeting and consultation requirements of Section 4350. Moreover, there is a two year statute of limitations from the date the plan took effect to challenge procedural defects of a regional plan. See 24 V.S.A. § 4483. Therefore, Applicant's claim is ultimately barred.

"unrestrained and arbitrary." See Vincent v. Vt. State Retirement Bd., 148 Vt. 531, 535 (1987) (quoting State v. Chambers, 144 Vt. 234, 239 (1984)); In re Handy, 171 Vt. 336, 345–47 (2000) (noting the applicability of the nondelegation doctrine to local zoning boards).

While the structure of the regional planning commissions' enabling statute does give us some concern in that it allows the regional planning commissions to define the scope of their own authority, see 24 V.S.A. § 4348(h)(2), we conclude that Section 4345a, in combination with the entirety of Chapter 117 of Title 24, does provide guidance to the regional planning commissions by specifying the scope of their duties as well as the requirements for their regional plans. See 24 V.S.A. §§ 4345a–4348(b). Furthermore, substantial regional impact is necessarily a region-specific concept that is likely best determined on a regional level. Ultimately, however, we need not reach the delegation issue as it is unnecessary for our holding here, since we ultimately determine that Applicant does satisfy Criterion 10. See State v. Bauder, 2007 VT 16, ¶ 28, 181 Vt. 392 ("It is, of course, a fundamental tenet of judicial restraint that courts will not address constitutional claims—least of all novel or unresolved constitutional claims—when adequate or lesser grounds are available.").

Regarding Applicant's second point, the Court rejects Applicant's argument that the definition of substantial regional impact does not provide a clear and applicable standard. Like the delegation of legislative authority, zoning standards must be sufficiently clear and definitive to prevent arbitrary application and to provide adequate notice. See In re Appeal of JAM Golf, LLC, 2008 VT 110, ¶ 13, 185 Vt. 201. The 2007 Regional Plan defines substantial regional impact as any development that meets one or more of eight criteria. The relevant criteria for the proposed development are as follows:

> (2) A development that may significantly affect existing capacity of regional public facilities by:
>
> (a) contributing to a reduction in the peak hour Level of Service (LOS) from D to E or from E to F;
> (b) contributing five percent or more to the peak hour Level of Service (LOS) D on a regionally significant local or State highway in or immediately adjacent to regional growth areas or LOS C on regionally significant local or State highways in rural areas;
> . . .

(d) necessitating substantive capital improvements, such as widening or signalization of regionally significant local or State highways;

. . .

(5) A development which impairs the continued function of significant regional facilities, including, but not limited to, Interstate highway systems, waterways, educational institutions, hospitals, recreational facilities, bridges, dams, airports and trails.

(6) A development exceeding the following thresholds:

. . .

(b) commercial or industrial construction involving 20,000 square feet or more of gross floor area.

(Two Rivers—Ottauquechee Regional Plan at 269, adopted May 30, 2007) [hereinafter 2007 Regional Plan]. These criteria are not vague or standardless, but rather are sufficiently clear to prevent discriminatory application and to adequately inform landowners of what types of projects will result in a substantial regional impact. See JAM Golf, 2008 VT 110, ¶ 13. We therefore reject Applicant's claim that the definition of substantial regional impact is vague or otherwise infirm.

Finally, Applicant takes issue with the Regional Commission's definition of substantial regional impact and claims that, by defining substantial regional impact to include projects that decrease the LOS, the Regional Plan creates an end-run around the rule that an Act 250 permit cannot be denied for failing to comply with Criterion 5's traffic requirements. See Re: Pittsford Enters., No. 1R0877-EB, Findings of Fact, Conclusions of Law and Order, at 36 (Vt. Envtl. Bd. Dec. 31, 2002) (noting that permits cannot be denied for failing to be satisfy Criterion 5, they may only be conditioned on traffic mitigation measures). The Court rejects this argument. Defining substantial regional impact as a project that "contributes to a reduction in the peak hour Level of Service (LOS) from D to E or from E to F," does not improperly circumvent Criterion 5 to defeat a project on traffic impact grounds. The Regional Commission has been delegated the authority to define substantial regional impact, and so long as that definition is sufficiently particular, the Regional Commission is not precluded from employing a definition merely because it has some overlap with issues addressed under Criterion 5. Moreover, under the 2007 Regional Plan, the fact that a project will have a substantial regional impact due to its

traffic congestion impact does not, as Applicant suggests, result in an immediate denial of the project, but rather merely triggers further review. See 24 V.S.A. § 4348(h)(2).

Finding that the 2007 Regional Plan's definition of substantial regional impact is not infirm, we must next address whether the Project meets the definition (Question 9). It is uncontested that the Project as proposed will be greater than 20,000 square feet and will require substantial capital improvements of a local or State highway. Phase 1 of the Project is over 100,000 square feet of office, retail, and residential space, and as conditioned above, the Project will require Applicant to install a traffic light and turning lanes in order to mitigate Act 250 Criterion 5 concerns.[6] Either of these facts would meet one or more of the eight criteria in the 2007 Regional Plan's definition of substantial regional impact. Therefore, because the Project will result in a substantial regional impact, the 2007 Regional Plan applies.[7]

### b.     Does the Plan Prohibit the Project? (Applicant's Questions 12, 13, 14)

Finding the 2007 Regional Plan applies, we must consider whether the 2007 Regional Plan prohibits the Project (Questions 12, 13, and 14). The Regional Commission argues that the Project violates five provisions of the 2007 Regional Plan. In considering the 2007 Regional Plan provisions cited by the Regional Commission, we conclude that each provision is either an unenforceable policy aspiration or provides restrictions inapplicable to the Project. We address each of these provisions.

We have been cautioned against denying an Act 250 permit based on nonconformance with "nonregulatory abstractions" in a municipal or regional plan. In re Molgano, 163 Vt. 25, 31 (1994). As we stated earlier, a determination of nonconformity requires that the relevant plan provisions are mandatory and not merely aspirational, and "stated in language that 'is clear and

---

[6] The District Commission also found a substantial regional impact because the Project would contribute to a reduction in the peak hour LOS from D to E or from E to F. See In re B&M Realty, LLC, Findings of Fact & Conclusions of Law & Order, at 33–34 (Dist. Envtl. Commission, July 3, 2013). At trial, however, it was revealed that the level of service is currently an F, and the proposed traffic measures—a traffic control light and turning lanes—will improve the LOS to a B; thus there is no substantial regional impact on the basis of the Project's contribution to the LOS.

[7] Applicant's Question 7 asks, "Which party has the burden to demonstrate that a project has a "substantial regional impact?" We begin with the principle that the applicant always has the burden of producing sufficient evidence to enable the Court to make the requisite positive findings on all of the criteria. Ultimately, however, the answer is not critical to our discussion here, as the parties have produced sufficient evidence for the Court to determine whether the Project has a substantial regional impact.

unqualified, and creates no ambiguity.'" In re John A. Russell Corp., 2003 VT 93, ¶ 16, 176 Vt. 520 (quoting In re Green Peak Estates, 154 Vt. 363, 369 (1990); In re MLB Assocs., 166 Vt. 606, 607 (1997) (mem.) (internal citations omitted)). Furthermore, a provision of a regional plan that fails to provide adequate guidance and allows the unbridled discretion of the regional planning commission is unenforceable. See JAM Golf, 2008 VT 110, ¶ 13 ("We will not uphold a statute that "fail[s] to provide adequate guidance," thus leading to "unbridled discrimination" by the court and the planning board charged with its interpretation."); see also In re Application of Lathrop Ltd. Partnership I, 2015 VT 49, ¶ 29, 121 A.3d 630 (noting that ambiguous regulations risk arbitrary enforcement, and that courts will therefore construe zoning regulations strictly and in favor of the property owner); In re Kisiel, 172 Vt. 124, 140 (2000) (holding that Town plan must have "some objective measure to guide enforcement" of a stated prohibition on development).

The primary focus of the Regional Commission's opposition to the Project is that "[p]rincipal retail establishments must be located in Town Centers, Designated Downtowns, or Designated Growth Centers to minimize the blighting effects of sprawl and strip development along major highways and to maintain rural character." 2007 Regional Plan at 33. The Regional Commission asserts that the "principal retail establishment" (PRE) provision provides a clear and mandatory bar to the Project. The 2007 Regional Plan, however, does not define the term "principal retail establishment." The Regional Commission argues that the PRE provision, when read in combination with the other requirements of the 2007 Regional Plan, is sufficiently clear to find it mandatory and enforceable. While the PRE provision may use mandatory language, it is not clear that the provision applies to the Project. Accordingly, we must first determine the meaning of "principal retail establishment," before we can conclude whether the PRE provision acts as a bar to the Project.

When interpreting a provision of a regional plan, we are directed to "construe[] [the terms] according to the ordinary rules of statutory construction." In re MBL Associates, 166 Vt. 606, 607 (1997). Therefore, we will interpret the phrase "principal retail establishment" according to the ordinary meaning of the words and refer to dictionary definitions when necessary. See Franks v. Town of Essex, 2013 VT 84, ¶ 8, 194 Vt. 595 ("Words that are not defined within a statute are given their plain and ordinary meaning, which may be obtained by resorting to dictionary definitions."). Black's Law Dictionary defines the term "principal" to

mean "chief; primary; most important." Black's Law Dictionary, principal (10th ed. 2014) (WL). Thus, the phrase "principal retail establishment" means a project where retail is the chief, leading, or most important use.

Applying that definition here, we find that the Project's uses do not make it a principal retail establishment. Phase 1 of the Project includes 115,000 square feet of commercial, residential, and retail space. Of the 115,000 square feet, less than 40,000 are proposed as retail space. The majority of the square footage, more than 66,000 square feet, will be devoted to office space. The remaining space is residential. The Court finds that retail is not the primary or chief use of the Project, and thus, the Project does not constitute a "principal retail establishment" pursuant to the 2007 Regional Plan.[8] The (PRE) provision does not, therefore, apply to the Project.

We next consider the provision in the 2007 Regional Plan stating that "[the] existing settlement pattern . . . [provides] a system of centers both efficient and economical for the conduct of business enterprise and for the provision of social and community facilities and services. This pattern must be protected and enhanced and is supported by state planning law." 2007 Regional Plan at 26.   While this provision directs that existing settlement patterns must be protected, it provides no clear guide or criteria to be met in order to protect the existing settlement pattern. Instead of a mandatory requirement, this provision is more appropriately considered an overarching theme for the Regional Plan. Indeed, the provision appears under the subsection labeled "Goals-The Future Pattern of Settlement," 2007 Regional Plan at 26, confirming its merely advisory nature.   We conclude that this provision does not bar the Project because it is merely an aspirational policy statement.

Similarly, the provision stating that "[a]ny development planned for interchange development must be constructed to . . . discourage creation or establishment of uses deemed

_____

[8] Question 12 asks, "Can a regional plan permissibly restrict 'principal retail establishments' to only Town Centers, Designated Downtowns, or Designated Growth Center or is such zoning function reserved to municipalities?" (Applicant's SOQ 12). Applicant points to no case law or authority, and the Court is not aware of any, that prohibits a regional commission from limiting principal retail establishments to town centers, designated downtowns, or designate growth centers. 24 V.S.A. §§ 4345–50 and Act 250 Criterion 10 clearly envision that the regional plan may conflict with the municipal plan, and often, the regional plan is given superiority. See 24 V.S.A. § 4350(b)(1) ("The Commission shall approve a plan if it finds that the plan . . . is compatible with its regional plan."). Ultimately, however, we need not answer this question as the Court concludes that the Project is not a principal retail establishment.

more appropriate to regional growth areas," Id. at 46–47, is unclear and leaves unbridled discretion with the Regional Commission. Again, while this statement may evince a worthy aspiration, it fails to establish clear and mandatory criteria, but instead leaves the decision of what is "appropriate" to the Regional Commission. Thus, this provision is unenforceable as it fails to provide adequate guidance and allows the unbridled discretion of the regional planning commission. See JAM Golf, 2008 VT 110, ¶ 13

The Regional Commission also points to a provision under the subsection, "Goals-The Future Pattern of Settlement," which states, "Major growth or investments must be channeled into or adjacent to existing or planned settlement centers and to areas where adequate public facilities and services are available." Id. at 27. While this statement appears to create a mandatory standard, the critical words are undefined and subject to interpretation, rendering the Court unable to "discern a specific policy" or prohibition of the Project from this statement. See In re John A. Russell Corp., 2003 VT 93, ¶ 19 (holding that where a plan fails to convey a specific policy preventing the proposed development, the boards interpretation of the plan is not grounds to deny the project). The 2007 Regional Plan does not define the term "major growth or investment," and its meaning is subject to a wide degree of interpretation. Therefore, this standard gives unfettered discretion to the Regional Commission, and thus, cannot be grounds for denying a proposed development. See JAM Golf, 2008 VT 110, ¶ 13.

Similarly, the provision requires that major development must be located in a planned settlement area, yet the term "planned settlement area" is also undefined. While the Regional Commission argues that the terms "major growth" and "planned settlement area" are sufficiently clear to provide mandatory and applicable standards, and that the Project is certainly major development outside of any planned settlement area, these conclusion are not clear from the Regional Plan itself. See Re: EPE Realty Corporation and Fergessen Management, Ltd., No. #3W0865-EB, Findings of Fact, Conclusion of Law, and Order, at 40 (Vt. Envtl. Bd. Nov. 24, 2004) (noting that the plan speaks for itself and the court must make its own judgment on whether a project conforms to the plan). Because we find this provision fails to establish a clear, unqualified, and unambiguous standard, the Court cannot deny the Project on the grounds that it constitutes major growth outside of a planned settlement area. See In re John A. Russell Corp., 2003 VT 93, ¶ 16.

23

Lastly, the Regional Commission focuses on the provision of the 2007 Regional Plan that concludes that Exit 1 is not an appropriate location for a growth center. 2007 Regional Plan at 27. The Plan designates two types of growth centers; Regional Growth Centers and Designated Growth Centers. Regional Growth Centers are "the traditional developed areas in the region." Id. Designated Growth Centers are areas that a municipality seeks designation for based on a number of criteria and that must receive approval from the Vermont Downtown Board before the designation may take effect. Id. at 28. While the prohibition of growth centers from Exit 1 appears clear and unambiguous, it is inapplicable to the Project. The Project is not located in an area where traditional development has occurred, and no party is seeking to have the Project receive a growth center designation. Therefore, the 2007 Regional Plan's limitation on growth centers at Exit 1 does not prohibit the Project.

As we find that there are no applicable mandatory and unambiguous provisions of the 2007 Regional Plan that prohibit the Project, we conclude that the Project conforms to the Regional Plan, and thus, complies with Act 250 Criterion 10.[9]

### Conclusion

Regarding the post hearing motion, the Court **GRANTS** in part and **DENIES** in part the Ratajs' motion to reopen the evidence. The Court admits the Ratajs' Exhibits A and B, but denies the Ratajs' request to recall Mr. Saladino and to offer a rebuttal witness.

On the merits, the Court concludes, for the above reasons, that the Project complies with Act 250 Criterion 5 with the imposition of the following conditions to mitigate traffic concerns.

    a. The Applicant shall request a formal speed study to examine lowering the posted speed limit on U.S. Route 4 from the I-89 southbound ramp to the I-89 northbound ramp from 45 mph to 40 mph after completion of each phase of development.

    b. Prior to completion of Phase 1A, Applicant shall construct a westbound left turn lane at the U.S. Route 4/I-89 southbound ramp intersection for traffic entering I-89 southbound. This work shall include reducing the width of the shoulder along U.S. Route 4 in the area of the convenience store/gas station to eliminate tractor

---

[9] We note that our conclusion would have been the same if we had found that the Municipal and Regional Plans did not conflict.

trailer parking in this area. Roadside vegetation shall be cut back along the inside curve of U.S. Route 4 east of the Project access road and between I-89 northbound and southbound ramps.

c. Prior to completion of Phase 1A, an actuated traffic signal shall be installed at the U.S. Route 4/I-89 northbound ramp. Applicant shall pay its proportional share of mitigation measures for this existing adverse traffic and safety condition.

d. Prior to completion of Phase 1B, Applicant shall construct a westbound right turn lane on U.S. Route 4 into the Project site.

e. Prior to completion of Phase 1C, Applicant shall construct an eastbound left turn lane on U.S. Route 4 into the Project site.

The Court imposes these traffic mitigation measures; however, we leave it to the parties to work through the financing details for the required actuated traffic signal to be installed at the U.S. Route 4/I-89 northbound ramp.

As conditioned, we also conclude that the Project will not unnecessarily or unreasonably endanger the public or quasi-public investment in or materially jeopardize or interfere with the function, efficiency, or safety of, or the public's use or enjoyment of or access to adjacent public facilities, and therefore, complies with Act 250 Criterion 9(k). Lastly, we conclude that there are no applicable mandatory and unambiguous provisions of the 2007 Regional Plan that prohibit the Project. Thus, the Project conforms to the Regional Plan and complies with Act 250 Criterion 10.

This matter is remanded to the District Environmental Commission #3 for the ministerial act of issuing an Act 250 Land Use Permit consistent with this merits decision and the unappealed portions of the Commission's July 3, 2013 decision.

This concludes this matter.


Electronically signed on November 12, 2015 at 1:31 PM pursuant to V.R.E.F. 7(d).

_Tom Walsh_

_____
Thomas G. Walsh, Judge
Superior Court, Environmental Division